Rene KVASNIKOFF, Appellant,

v.

STATE of Alaska, Appellee.

Della Rae FANNIN, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–2832, A–2929.

Court of Appeals of Alaska.

Jan. 18, 1991.

Joel H. Bolger and Walter W. Mason, Jamin, Ebell, Bolger & Gentry, Seattle, Wash., for appellant Fannin.

Leslie A. Hiebert, Asst. Public Advocate, and Brant McGee, Public Advocate, Anchorage, for appellant Kvasnikoff.

Valerie A. VanBrocklin, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, District Court Judge.*

OPINION

BRYNER, Chief Judge.

Della Rae Fannin and Rene Kvasnikoff entered pleas of no contest to a charge of

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

misconduct involving a controlled substance in the fourth degree (possession of cocaine), preserving their right to appeal the superior court's order denying their motion to suppress evidence. On appeal, Fannin and Kvasnikoff claim that the superior court erred in finding that the search warrant that led to the charges against them was supported by probable cause. We reverse.

## FACTS

On the evening of January 29, 1989, Kodiak resident Dee Vinberg visited a friend, Jennifer Clark. Vinberg's seventeen-year-old nephew, Brett Merrigan, accompanied her to Clark's house. During that night and the following morning, Vinberg and Clark repeatedly used cocaine at Clark's house. On the morning of January 30, Vinberg suffered an overdose. Clark summoned an ambulance, which transported Vinberg to the hospital.

Later that day, the state applied to Superior Court Judge Roy H. Madsen for a warrant to search Clark's house. Judge Madsen heard from three witnesses: Kodiak Police Detective William Walton, Dee Vinberg's nephew Brett Merrigan, and Emergency Medical Technician (E.M.T.) Steve Englund.

Walton testified first. He stated that the Kodiak crimestoppers line had received a call from Daniel Merrigan—Vinberg's brother-in-law and the father of Brett Merrigan—reporting that Vinberg was at the hospital and wanted to talk to the police. Walton contacted Vinberg at the hospital; she was still visibly under the influence of cocaine. Vinberg told Walton that Jennifer Clark had given her cocaine at Clark's house and that she (Vinberg) had had a bad reaction to it. Vinberg said that Clark had told her that the cocaine "was not cut very much."

Walton further testified that Daniel Merrigan later called the Crimestoppers line again and reported that his son, Brett, had been given some cocaine by Vinberg, which

Brett had hidden because he was afraid. Walton asked Merrigan to bring in the cocaine. A short time later, Merrigan delivered a plastic baggie containing approximately one ounce of a white powdered substance. Walton field-tested the powder; the test revealed it to be almost pure, uncut cocaine.

Brett Merrigan testified next. He said that he had been living with his aunt, Dee Vinberg, and had gone with her to Clark's house on the evening of January 29. During the evening, he saw Vinberg and Clark go upstairs to Clark's bedroom several times. Each time they returned, he noticed that they were abnormally active and talkative and were sniffling and touching their noses. Brett also saw razor blades with a white powdery substance on them, along with straws, gram scales, and gram slips. Brett had previously seen people under the influence of cocaine and believed that Vinberg and Clark were ingesting cocaine.

Brett additionally testified that, at some point in the evening of January 29, Clark and Vinberg left Clark's house. He saw them again the next morning, when they came to Vinberg's house. Vinberg and Clark went upstairs for a few minutes; when they returned they again appeared to be under the influence of cocaine.

Brett then accompanied Vinberg and Clark to Clark's house. Upon arrival, Vinberg and Clark went into Clark's bathroom; Brett left for a short time. As he returned to Clark's house, Brett heard someone yell and saw Vinberg fall to the livingroom floor in spasms. Clark and Brett tried to revive Vinberg. Clark's boyfriend, whose name Brett did not know, was also present.

According to Brett's testimony, the paramedics arrived soon afterwards. Brett stated that Clark told the paramedics that Vinberg must have been "tooting some coke." When the paramedics took Vinberg to the hospital, Brett rode with them in the ambulance. On the way, Vinberg twice told Brett that she had "it" on her. He did not immediately understand what she

meant. However, after arriving at the hospital and being taken to the emergency room, Vinberg handed Brett a baggie of cocaine from under her sheet. Brett testified that he later told his father about the cocaine. His father turned the baggie over to the police.

The third witness at the warrant hearing, E.M.T. Steve Englund, testified that he had been dispatched to Clark's house on the morning of January 30. There, he found Vinberg agitated and thrashing—symptoms consistent with cocaine overdose. Clark initially told Englund that she did not know what was wrong with Vinberg. Later, however, she said that Vinberg had "possibly" taken cocaine. Englund recalled that Brett Merrigan accompanied Vinberg to the hospital. At the hospital, Englund saw a white powdery substance in Vinberg's right nostril.

After hearing from these witnesses, Judge Madsen issued a warrant to search Clark's home for cocaine and related paraphernalia. The police executed the warrant that afternoon but found no drugs.

Four days later, on February 3, 1989, the state returned to Judge Madsen for another search warrant. After incorporating by reference the evidence presented at the January 30 warrant hearing, the state called Detective Walton and Daniel Merrigan, Brett's father, as witnesses.

Walton testified that, when the police executed the January 30 warrant, they found Clark and her boyfriend, Raphael Bravo, at Clark's residence. Although the search failed to turn up any cocaine, baggies similar to the one that contained Vinberg's cocaine were found in Clark's bedroom—in a dresser drawer, under the bed, and in a trash basket.

Police also found signs that evidence had recently been concealed or destroyed: Clark had told police officers conducting the search that she had had lines of cocaine on top of her dresser and on a paper plate in the bathroom; no paper plate was found, however, and the top of the dresser appeared to have been freshly cleaned and polished.

Walton also gave further information about his January 30 interview with Dee Vinberg. He said Vinberg told him she thought the cocaine she and Clark had used on the night of January 29 came from "Della the lesbian's house on the hillside." Walton believed that Vinberg meant Della Fannin, since Fannin lived on the hillside and the Kodiak police had received numerous drug-related complaints about her. Walton testified that he checked Crimestoppers reports dating back slightly less than two years and discovered six calls complaining of apparent cocaine trafficking at Fannin's house. The callers described large amounts of traffic and continual parties. Walton believed that a search warrant had previously been executed at Fannin's house but had failed to disclose any drugs.

Daniel Merrigan supplied the balance of the testimony at the February 3 warrant hearing. He testified that Dee Vinberg had been charged with misconduct involving a controlled substance in the first degree for giving cocaine to Brett Merrigan; on February 2, the court released Vinberg from jail, to Daniel Merrigan's custody. That evening, Merrigan spoke with Vinberg about her overdose.

Vinberg told Merrigan that the cocaine she gave to Brett at the hospital came from Jennifer Clark. Vinberg further said that she was positive that "a girl by the name of Della that lived on Hillside Avenue had the same amount and the same quality of cocaine in her possession...." According to Merrigan, Vinberg also said that the cocaine "was the same batch from this Raphael Bravo that was at Jennifer Clark's apartment." Vinberg thought the cocaine came from Bravo and believed that Clark had sold several grams and had given the money to Bravo. Vinberg also said that she thought "Della was probably trying to sell as much as she could to bail Jennifer [Clark] out." Although Vinberg told Merrigan "that it was known that Della dealt

in the stuff," Vinberg did not say she had ever actually bought any from Della or that she had ever been to Della's house.

Merrigan went on to say that he had a second conversation with Vinberg on the morning of February 3. He told Vinberg that he was concerned that the cocaine that had caused her overdose "should be off the street because it's very dangerous." He also told Vinberg that "it'd be better for her if she cooperated with the police 100 percent and told them what she told me about Della." Vinberg agreed that Merrigan could tell the police.

After hearing this testimony, Judge Madsen asked Merrigan if Vinberg ever said how she knew that Della had the same quality and quantity of cocaine as Jennifer Clark. The following exchange occurred:

A: Well, I guess Della and Jennifer were friends and they—she's been down to Jennifer's. And, Jennifer had told her too that Della had some of the same stuff, or baggies of the same stuff that she had, this cocaine. The conversation went back and forth, but it appeared to me that this Mr. Bravo and Jennifer had supplied Della with this baggie to sell, just from the way Dee was talking.

Q: And the gist of her conversation was that Mr. Bravo had supplied the cocaine, and that some of it had gone to Jennifer, and some of it had gone to Della?

A: The same amount that Jennifer had in a baggie was the same amount that this Della received. It was from the same batch.

Q: And, she didn't say that she'd ever been in Della's house, right?

A: She didn't last night, but she said she was positive in talking with Jennifer that Jennifer said that Della had the same amount as she did. But, no, she never mentioned going into the house.

Q: How did the—you said the conversation arose about your expressing your

fears about this being in the community and it was dangerous, is that right?

A: Right.

Q: And, this was her response?

A: Yes. She had—she had said that she wanted to see a stop put to it too and that it was—I had mentioned too that the police wanted the stuff off the street, and advised her, I said, if you want to get it off the street, you'd better tell me everything you know so we can talk it over with the police, or whatever way you want to do it, I said, but it's—any information that you can tell the police, or tell me and I'll tell the police, it doesn't matter to me, I says it's very advisable to do that. And, that's when she advised me about Della having this ounce or baggie of cocaine.

Q: Did she say how she came by the information that Della was selling cocaine?

A: Through Jennifer.

On the basis of this testimony, Judge Madsen issued a warrant authorizing the search of Della Fannin's house. Execution of the warrant led to the discovery of cocaine in the possession of Fannin and Kvasnikoff. After being charged with misconduct involving a controlled substance in the fourth degree, Fannin and Kvasnikoff moved to suppress the evidence, alleging that the February 3 search warrant was not supported by probable cause. In particular, Fannin and Kvasnikoff argued that Daniel Merrigan's testimony was based on unreliable and insufficiently corroborated hearsay. Superior Court Judge Peter A. Michalski denied the motion.

## DISCUSSION

■ On appeal, Fannin and Kvasnikoff renew the argument that they raised below. The state counters that, although Daniel Merrigan's testimony contained hearsay, it was sufficient to support a find-

ing of probable cause.[1]

■ As the parties in this case recognize, the validity of the February 3 search warrant turns on the reliability of the hearsay statements described in Daniel Merrigan's testimony. The ground rules that apply in such cases are well established. In *State v. Jones*, 706 P.2d 317, 324 (Alaska 1985), the Alaska Supreme Court elected to follow the *Aguilar/Spinelli* test in determining whether hearsay information establishes probable cause for issuance of a warrant.[2] Under this two-pronged test, hearsay may be relied on to support a finding of probable cause when sufficient evidence is presented to enable the issuing magistrate to determine the veracity and reliability of the hearsay; the magistrate must be able to find that the hearsay declarants' statements were truthful and based on personal knowledge. *Jones*, 706 P.2d at 324–25; *State v. Bianchi*, 761 P.2d 127, 136 (Alaska App.1987).

When multiple levels of hearsay are involved, the *Aguilar/Spinelli* test continues to apply but must be met at each level of hearsay. *Resek v. State*, 644 P.2d 877, 878–79 (Alaska App.1982). We apply the *Aguilar/Spinelli* test flexibly, carefully

considering the unique facts of each case. *Jones*, 706 P.2d at 324; *Bianchi*, 761 P.2d at 130.

■ Our flexible approach to the *Aguilar/Spinelli* test is in keeping with the more general rule that deference must be given to the decision of the issuing magistrate, with doubtful or marginal cases to be resolved in favor of upholding the warrant:

> In reviewing a magistrate's determination of probable cause this court must give great deference to the magistrate's decision and must resolve doubtful or marginal cases largely by the preference to be accorded warrants.... "The fourth amendment's requirements are practical and not abstract, and affidavits must be tested and interpreted by magistrates and courts in a common sense and realistic fashion...." The burden of proof on questions pertaining to sufficiency of affidavits is on the defendant.

*Morrow v. State*, 704 P.2d 226, 228–29 (Alaska App.1985) (citations omitted).

■ In the present case, we must apply the *Aguilar/Spinelli* test to the statements that Dee Vinberg made to Daniel Merrigan.[3] We assume for purposes of

---

**1.** The state also contends, for the first time on appeal, that Kvasnikoff lacked standing to challenge the search warrant. However, in *Steagald v. United States*, 451 U.S. 204, 209, 101 S.Ct. 1642, 1646, 68 L.Ed.2d 38 (1981), the United States Supreme Court concluded that the government can lose the right to argue standing on appeal "when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise [the question] in a timely fashion during the litigation." *See also United States v. Garcia*, 882 F.2d 699, 701 (2d Cir.1989); *Murdock v. State*, 664 P.2d 589, 595 (Alaska App.1983); *Unger v. State*, 640 P.2d 151, 156 n. 6 (Alaska App.1982). While there may be some situations in which the state should be allowed to raise the issue of standing for the first time on appeal, we conclude that the present case is not one of them. Here, the trial court resolved Kvasnikoff's suppression motion on its merits; because the state did not object to consideration of Kvasnikoff's claim, the court did not inquire into the factual circumstances relating to the issue of standing. After the court denied Kvasnikoff's motion on its merits, Kvasnikoff entered a plea of no contest, with the

state stipulating to her right to appeal the trial court's ruling. Kvasnikoff's decision to proceed in this manner may well have been influenced by the state's apparent acquiescence to reviewing the merits of the suppression issue on appeal. Under these circumstances, we find that the state's failure to raise the issue of standing in a timely manner precludes it from raising the issue for the first time on appeal.

**2.** *See Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The *Aguilar/Spinelli* test was abandoned as a matter of federal constitutional law by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Jones*, the court retained the *Aguilar/Spinelli* test under the Alaska Constitution.

**3.** Because Daniel Merrigan personally appeared before the issuing magistrate and testified under oath, his own truthfulness need not be corroborated under the *Aguilar/Spinelli* test. *See Hodsdon v. State*, 698 P.2d 1224, 1226–27 (Alaska App.1985).

this opinion that Vinberg's veracity was properly demonstrated. We thus turn to the "reliability" prong of *Aguilar/Spinelli*, which addresses the basis of Vinberg's knowledge.

■ The threshold problem in deciding whether Vinberg's statements to Merrigan were based on personal knowledge is determining precisely what Vinberg told Merrigan. The uncertainty stems from Merrigan's imprecise testimony concerning his conversation with Vinberg. Merrigan testified that, from his conversation with Vinberg, "it appeared to me that this Mr. Bravo and Jennifer had supplied Della with this baggie to sell, just from the way Dee was talking." On its face, this testimony does not relate what Vinberg actually said, but only what Merrigan concluded that she meant, based on his interpretation of "the way [she] was talking." Merrigan's failure to distinguish between Vinberg's statements and the conclusions that he drew from those statements afforded the magistrate little basis for forming his own conclusions as to what Vinberg had told Merrigan and what she might have meant by it.

The conclusory nature of this testimony is troublesome. As Professor LaFave says: "If there is one bright star in the fourth amendment heaven, it is that probable cause must be shown on the basis of facts rather than mere conclusions." 1 W.F. LaFave, *Search and Seizure*, § 3.2(d) at 585 (1987).

The problem is compounded, moreover, in the ensuing exchange between Judge Madsen and Merrigan. The judge asked Merrigan if the "gist" of Vinberg's conversation was that "Bravo had supplied the cocaine, and that some of it had gone to Jennifer, and some of it had gone to Della." Merrigan did not directly confirm Judge Madsen's interpretation of the conversation. Instead, he responded: "The same amount that Jennifer had in a baggie was the same amount that this Della received. It was from the same batch."

The state reads Merrigan's response as accepting the court's characterization of the "gist" of Vinberg's statement and adding that Vinberg also said that Fannin had the same amount and quality of cocaine. In contrast, Fannin and Kvasnikoff insist that Merrigan simply sidestepped the court's characterization of the conversation and substituted a different, more accurate version.

To us, the true meaning of Merrigan's response seems uncertain. Even if Merrigan meant to agree with the court's view of the "gist" of the conversation, the word "gist" is itself problematic, because it implies that Merrigan was relating inferences that he had personally drawn from Vinberg's conversation rather than statements that Vinberg herself made. On balance, we are inclined to favor the interpretation of Merrigan's testimony that has been proposed by Fannin and Kvasnikoff. Our own preference in the matter is somewhat beside the point, however. The pertinent issue is not what Merrigan truly meant, but what Judge Madsen could reasonably have understood him to mean. For present purposes, we may assume that Judge Madsen could reasonably have understood Merrigan as saying that Vinberg had expressly told him that Bravo was the source of Clark's cocaine and that Bravo had given the same quantity of cocaine to Fannin.

Even when we read Merrigan's testimony in this manner, its adequacy under *Aguilar/Spinelli* remains deeply problematic. Merrigan's testimony made it clear that Vinberg's information came from Jennifer Clark. Because Vinberg's knowledge was based on conversations with Clark, we are confronted with a second level of hearsay and must apply the *Aguilar/Spinelli* test separately to Clark's statements. Again, we may assume, for purposes of this discussion, that the "veracity" of *Aguilar/Spinelli* was met with respect to Clark's out-of-court statements to Vinberg. Under *Aguilar/Spinelli*, probable cause could not properly be found absent evidence to support the conclusion that Clark gave Vinberg reliable information about Fannin.

The state insists that there is ample basis for concluding that Clark's information was reliable, because, in telling Vinberg that Bravo had given Fannin the same quantity and quality of cocaine as she (Clark) had, Clark was obviously speaking from personal knowledge, since she was Bravo's girlfriend and was herself involved in dealing cocaine.

This argument would be tenable, however, only if Clark actually did tell Vinberg that Bravo gave Fannin cocaine. Yet nothing in Merrigan's testimony specifies that Clark told Vinberg that she and/or Bravo had supplied Fannin with cocaine. And even assuming that Vinberg specifically told Merrigan that Bravo gave Fannin cocaine, Merrigan's testimony fails to rule out the possibility that Vinberg's statement was based on speculation and conclusion rather than on direct statements made to her by Clark.

Merrigan testified that his conversation with Vinberg "went back and forth, but it appeared to me that this Mr. Bravo and Jennifer had supplied Della [Fannin] with this baggie to sell." As we have previously pointed out, this passage left it unclear whether Vinberg actually said that Bravo and Clark supplied Fannin with cocaine or whether Merrigan simply surmised this from his conversation with Vinberg. We assumed that Judge Madsen could reasonably have understood Merrigan to mean that Vinberg actually said that Clark and Bravo gave Fannin cocaine. Even given this assumption, Merrigan's testimony does not purport to say that Vinberg's statement was based on any direct statement made by Clark rather than on Vinberg's own surmise from her contacts with Clark.

The subsequent exchange between Merrigan and Judge Madsen provides no meaningful clarification. Reading the exchange in the light most favorable to the state, Judge Madsen asked Merrigan if the "gist" of his conversation with Vinberg was that Bravo had supplied both Fannin and Clark; Merrigan agreed that this was the "gist" and specified that the cocaine was from the same batch and in the same amount. At best, however, Merrigan's testimony describes what Vinberg told him. It does not purport to say that Vinberg's statements were based on remarks specifically made to her by Clark.

In short, given the lack of specificity in Merrigan's testimony, a two-step inference would be required to conclude that Clark personally told Vinberg that she and/or Bravo had supplied Fannin with cocaine: first, it would be necessary to infer that, when Merrigan testified, "It appeared to me that this Mr. Bravo and Jennifer had supplied Della with this baggie," he meant that this was what Vinberg told him; second, it would be further necessary to infer that Merrigan meant that Vinberg told him that Clark had specifically told her about supplying Fannin and had not simply surmised it from her contacts with Clark.

We find Merrigan's testimony too conclusory to support such an attenuated inferential process. Merrigan's testimony, as a whole, simply affords no assurance that the information concerning Bravo supplying Fannin with cocaine was based on Clark's personal knowledge.

■ We recognize that the reliability of the information that Vinberg purportedly received from Clark could have been shored up by independent evidence tending to corroborate that Fannin had received cocaine from Clark and/or Bravo. However, we find no adequate corroboration here. The independent evidence discovered by the police in investigating Vinberg's cocaine overdose provided ample basis to conclude that Vinberg, Clark, and Bravo might have been involved with cocaine at a commercial level. None of that evidence, however, indicated that Fannin was involved. Nor can corroboration be found in the evidence that the Kodiak Crimestoppers line had previously received reports of drug-related activities at Fannin's house. The conclusory and anonymous reports were based on past activities that had no apparent connection to the current case and no apparent

nexus to Bravo, Clark, or Vinberg. Furthermore, the accuracy of the Crimestoppers reports was open to at least some doubt, because a prior search of Fannin's house, presumably in response to the reports, had apparently yielded no evidence of drug-related activities.

In short, considering the totality of the record before the issuing court, we find insufficient evidence to establish the reliability of the out-of-court statements alleging that Fannin had received cocaine from Bravo. Because a showing of reliability was required under the *Aguilar/Spinelli* test, we must conclude that the search warrant was issued without probable cause.

The convictions are REVERSED.