Thomas H. **CHANDLER**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. A–3369.

Court of Appeals of Alaska.

April 17, 1992.

**790**

Walter Share, Seattle, and David B. Loutrel, Anchorage, for appellant.

Jill De La Hunt, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

Thomas H. Chandler pled no contest to a charge of possessing cocaine (misconduct involving a controlled substance in the third degree), reserving his right to appeal the superior court's denial of a motion to suppress evidence, in which Chandler argued that the evidence against him resulted from an unlawful search and seizure. Chandler now appeals. We reverse.

On September 30, 1988, Carl Ekman, a special agent for the Federal Drug Enforcement Agency (DEA), was in Ketchikan conducting an airport interdiction seminar for the Ketchikan Police Department. As part of the seminar, Ekman and several officers went to the Ketchikan airport to meet the Alaska Airlines afternoon flight from Seattle.

As passengers began to emerge from the jetway, Ekman and the Ketchikan officers who were with him watched. Chandler was one of the first passengers off the flight. He had a single carry-on bag. When Chandler reached the door of the jetway and was about to enter the terminal, he looked up and made eye contact with Ketchikan Police Detective Susan Pickrell, who stood next to Ekman. None of the officers wore uniforms, but Chandler had met Pickrell approximately six months before, when he came to the Ketchikan Police Station to retrieve a lost wallet.

Pickrell noticed that, as soon as Chandler saw her, he stepped back into the jetway and stopped. As he stood in the jetway, Chandler glanced back over his shoulder toward the airplane, as if waiting for someone. Pickrell immediately recognized Chandler. She was aware that Chandler had previously been charged with selling cocaine to an undercover police informant and that he had recently been described by an informant as one of the three biggest cocaine dealers in Ketchikan. On this basis, Pickrell pointed Chandler out to Ekman as a known drug dealer. Ekman and Pickrell focused their attention on Chandler.

Chandler, meanwhile, had remained in the jetway for approximately 45 seconds. After several other passengers walked by, Chandler emerged from the jetway and walked past the officers. He proceeded at a hurried pace down the stairway to ground level and out of the terminal building.

Ekman and Pickrell followed Chandler as he walked toward the exit. When Chandler rounded a corner on the staircase to the ground floor, Ekman and Pickrell saw him glance up furtively in their direction. The officers pursued Chandler out of the building and found him standing on the sidewalk.

Ekman approached Chandler, identified himself, and displayed his DEA identification. Ekman told Chandler that he was not under arrest and was free to leave. Ekman then asked to see Chandler's ticket.

Chandler became visibly nervous and upset. He could not produce a ticket. Ek-

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

man asked for other identification, and Chandler produced his wallet, from which he removed his driver's license. At this point, Chandler appeared extremely nervous. He was sweating profusely and seemed in a daze; he had difficulty speaking and his hands shook as they held his wallet.

Chandler asked Ekman why he was being stopped. Ekman explained that he had been watching Chandler's flight for people carrying drugs. Emphasizing again that Chandler was not under arrest and was free to leave, Ekman asked him for permission to inspect his bag. Chandler responded that he wanted to telephone his attorney. Ekman allowed him to do so. Chandler placed a call from a nearby pay phone.

While Chandler spoke with his attorney, Pickrell called the Ketchikan District Attorney's office, explained the situation, and was advised to seize Chandler's bag. When Chandler completed his telephone call and returned to Ekman, Chandler said that he had been advised not to allow the police to search his bag. Ekman then seized the bag, telling Chandler that the police would retain it until they could obtain a search warrant. Chandler was allowed to leave.

The police transported Chandler's bag from the airport to the police station, where they prepared paperwork to obtain a search warrant. A short time later, Superior Court Judge Thomas E. Schulz heard testimony from Ekman and Pickrell, and he issued a warrant authorizing them to search Chandler's bag. The warrant was issued slightly more than 90 minutes after the police seized Chandler's bag.

Returning to the police station, the officers opened and searched Chandler's bag. Among the bag's contents, they found an envelope containing approximately five ounces of cocaine. Chandler was thereafter charged with possessing the cocaine.

Prior to trial, Chandler moved to suppress the cocaine. He argued that the warrantless seizure of his bag at the airport was unlawful because it was not based on probable cause. He argued further that the subsequently issued search warrant was also not supported by probable cause. In addition, Chandler argued that the warrant was based on material misstatements by detective Pickrell.

Superior Court Judge Thomas E. Jahnke held an evidentiary hearing on Chandler's suppression motion. Judge Jahnke concluded that the seizure of Chandler's bag was justified by exigent circumstances and supported by probable cause. The judge also found that Ekman and Pickrell's testimony before Judge Schulz established probable cause for the search warrant. Although Judge Jahnke found several misstatements in Pickrell's testimony, he ruled that these misstatements were at most negligent and did not require suppression.

On appeal, Chandler renews the claims that he raised below.[1] We consider only the lawfulness of the warrantless seizure of Chandler's bag, since we find that issue dispositive.

The threshold question we must address is whether the warrantless seizure of Chandler's bag required probable cause. Chandler characterizes the police conduct as amounting to a full-scale seizure of his property, which can be justified only upon a showing of probable cause. *See, e.g., United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The state, on the other hand, maintains that the seizure can be characterized as the type of brief, minimally intrusive detention that requires only reasonable suspicion. *See, e.g., Beuter v. State*, 796 P.2d 1378, 1383 (Alaska App.1990).

■ During the proceedings below, both parties treated the seizure of Chandler's luggage as if it amounted to a full-scale seizure requiring probable cause. In finding probable cause to support the warrantless seizure, Judge Jahnke implicitly concluded that the seizure was not a limited investigative detention that could be justi-

---

**1.** Chandler also challenges Judge Jahnke's refusal to order disclosure of the full text of a statement made to the police by informant Joanne Ferguson. Given our disposition in this case, we need not address this issue.

fied by reasonable suspicion. This implicit finding is supported by the evidence.

The crucial distinction between a limited investigative detention and a full-scale seizure is the degree of intrusiveness. We have recognized that even a very brief detention of property may amount to a seizure requiring probable cause when it is particularly intrusive. *See Peschel v. State*, 770 P.2d 1144, 1147 (Alaska App. 1989). On the other hand, significantly longer periods may be permissible when detention of property does not interfere with the owner's actual possession or when no significant movement of the property occurs. At some point, however, the length of detention alone may preclude application of the reasonable suspicion standard. In *United States v. Place*, 462 U.S. at 706, 103 S.Ct. at 2644, the Supreme Court suggested that a 90–minute period of detention amounted to a seizure requiring probable cause.

In Chandler's case, the warrantless seizure exceeded the 90–minute period found impermissible in *Place*. The state nevertheless insists that time alone should not be determinative. Even if the state is correct, however, other factors in this case militate against the conclusion that the warrantless seizure of Chandler's bag was the type of limited investigative detention that can be based on reasonable suspicion.

Chandler's bag was an article of property that he carried on his person; it was seized directly from Chandler's possession. The bag was not merely immobilized at the point of seizure. Rather, it was transported a significant distance from the airport to the Ketchikan police station. The police mitigated the intrusiveness of this 90–plus minute detention by telling Chandler where they were taking his bag, their purpose in taking it, the approximate length of time that it would be held, and how Chandler could reclaim it. Although such measures might make the difference in a borderline case, they do not convert the kind of sei-

zure that occurred here into a brief, minimally intrusive detention of property. We conclude that the warrantless seizure required probable cause.

■ The state bears the burden of justifying a warrantless search or seizure; it was incumbent on the state to establish that probable cause existed when Ekman seized Chandler's bag. *Schikora v. State*, 652 P.2d 473, 475–76 (Alaska App.1982).[2]

■ Probable cause exists when "reliable information is set forth in sufficient detail to warrant a reasonably prudent [person] in believing that a crime has been or was being committed." *Badoino v. State*, 785 P.2d 39, 41 (Alaska App.1990) (quoting *Harrelson v. State*, 516 P.2d 390, 396 (Alaska 1973)). The existence of probable cause is a mixed question of fact and law. Absent clear error, we must accept the facts as the trial court finds them; whether probable cause arises from those facts, however, is a purely legal issue as to which we make a *de novo* determination. *LeMense v. State*, 754 P.2d 268, 272–73 (Alaska App.1988). The existence of probable cause depends on the facts actually known to the police when the challenged seizure occurred. In the present case, although Ekman was the officer who actually seized Chandler's bag, the collective knowledge of the officers participating in the case may be considered in determining probable cause.

Judge Jahnke found that probable cause to seize Chandler's bag arose from the combination of Chandler's suspicious airport conduct and information concerning his drug-related activities. We turn first to Chandler's airport conduct.

■ Chandler's conduct, as described by agent Ekman and detective Pickrell, was remarkably similar to the conduct involved in *State v. Garcia*, 752 P.2d 478, 481 (Alaska App.1988). Garcia was among the first ten passengers to get off a flight from

---

**2.** As part of its duty of justifying the warrantless seizure, the state also bore the burden of proving an exception to the warrant requirement. If probable cause existed, however, immediate warrantless seizure of Chandler's bag would

plainly have been justified by exigent circumstances. *See, e.g., Ingram v. State*, 703 P.2d 415, 422 (Alaska App.1985). The only disputed issue here is whether probable cause for the seizure existed.

Seattle to Anchorage. He had a single carry-on bag. Garcia looked "intent" and "business-like," and he glanced both ways as he got off the plane. He proceeded hurriedly to the baggage area; even though luggage had not yet been unloaded, Garcia walked through the baggage area, glancing around as he walked. When contacted, Garcia seemed nervous; although he displayed a valid driver's license, he was unable to produce a ticket for his flight.

In *Garcia*, we upheld the trial court's determination that these circumstances did not amount to reasonable suspicion supporting an investigative stop or detention. The circumstances of Chandler's case are arguably distinguishable from *Garcia* in that Chandler appeared to stop immediately upon seeing Susan Pickrell, whom he might have recognized as a police officer. Chandler was also arguably more nervous than Garcia. However, even if these relatively slight differences would support a finding of reasonable suspicion here, they plainly establish little more and certainly fall far short of amounting to probable cause.

We must thus turn to Chandler's past drug-related activities. At the time of the seizure, Pickrell was apparently the only person who had information concerning Chandler's background. We must thus inquire whether Pickrell had received "reliable information ... set forth in sufficient detail" to warrant the conclusion that Chandler was carrying drugs.

Pickrell had a two-fold basis for telling Ekman that Chandler was a known drug dealer. First, she was aware that Chandler had previously been charged with selling cocaine to an undercover police informant in Ketchikan. These charges, however, involved conduct occurring more than two and one-half years previously, and they were eventually dismissed. Pickrell was unfamiliar with the details of the charges.[3] This information could not reasonably be relied on to support probable cause.

Pickrell's second basis for believing that Chandler was a "known drug dealer" was her awareness of a statement given to Ketchikan police by an informant, Joanne Ferguson. Ferguson's statement to the Ketchikan police occurred on August 25, 1988—five weeks before Chandler's arrival at the airport. Ferguson had a prior record of drug offenses and was on probation. Three or four days before she gave her statement, she had apparently been arrested on new charges of possessing cocaine with intent to distribute. After spending several days in jail, Ferguson agreed to a police interview in order to explore the possibility of favorable treatment on her pending charges. Ferguson was aware that the police could not promise her any deals, but she believed that the district attorney would probably follow their recommendations.

---

**3.** In its brief, the state attempts to make much of the fact that Chandler was formally charged by a grand jury indictment in 1986. The state argues that, despite the eventual dismissal of the charges, the fact that a grand jury found the evidence sufficiently compelling to warrant indictment supports the conclusion that Chandler actually engaged in the alleged 1986 drug transactions. The state also points out that, although Chandler's charges were dismissed because they involved transactions that were not electronically recorded, numerous other cases in which the same informant engaged in recorded transactions with other defendants resulted in convictions. The state thus maintains that there is no basis for concluding that the undercover police informant was inherently unreliable.

The state's argument is largely irrelevant to the issue of probable cause for the warrantless seizure—an issue that depends on what Pickrell knew at the time Ekman seized Chandler's bag. We have found nothing in the record to establish that Pickrell was actually aware that Chandler had been formally indicted by the grand jury. Nor does the record contain any evidence indicating that Pickrell was aware of any specific facts allowing her to give credence to the previously dismissed charges. Appearing before Judge Schulz at the search warrant hearing, Pickrell did provide specific dates and a certain amount of detail concerning Chandler's 1986 charges. As the state acknowledges, however, Pickrell's testimony was based on her post-seizure review of Chandler's file. At the evidentiary hearing on Chandler's motion to suppress, Pickrell testified that she did not participate in the 1986 undercover investigation and that she first learned of Chandler's charges only after the fact—sometime in 1987. Pickrell disclaimed any knowledge of the specifics of the case, saying that she knew little other than the fact that Chandler had been charged and that the charges were later dismissed.

In the course of her interview, Ferguson stated that there were three "big men" separately involved with "mass quantities of cocaine in Ketchikan." Ferguson identified Chandler as one of these "big men." When asked how much "mass quantities" meant, Ferguson responded, "I'd say a pound's the top." Ferguson said she was sure that none of the three men kept cocaine in their residences, but she did not know where they did keep it.

When asked if she had bought cocaine from "these three people," Ferguson replied that she had. She also indicated that she had dealt with them "recently," but gave no detail about how recently, and provided no follow-up as to whether she meant that she had recently dealt with all three men or just one or two. Ferguson further indicated that she had had "extensive dealings" with the three men. Again, however, she did not provide details or specify whether she meant that she had had extensive dealings with each of the three men.[4]

When the police asked Ferguson if she knew that Chandler had his own airplane, Ferguson said that she did. She also answered "yes" when asked "does he fly the stuff back and forth pretty regular ... ?" According to Ferguson, Chandler had no "set pattern" for bringing in cocaine: "He changes his pattern every time. Like last time he flew to Juneau and took the ferry down." Ferguson did not say when "last time" was or how she learned this information. She provided no further detail.

Ferguson indicated that Chandler picked up his cocaine in Seattle but did not know where. She stated that, in Seattle, she once met "the guy" who furnished Chandler with cocaine. She described "the guy" as "real grubby looking," but did not recall his name. Ferguson did not state how she came to meet this person or what led her to believe that he was Chandler's source of cocaine. Ferguson stated that this was her only knowledge of any "connections" that any of the three "big men" had.

When the police questioned Ferguson about the largest amount of cocaine she had ever held for Chandler, she replied that he had once "fronted her" two ounces of cocaine. Based on Chandler's willingness to front cocaine to her, Ferguson believed that she was "relatively trusted" by him. However, when asked if she knew who else Chandler "fronted dope to," Ferguson replied, "I have no idea, I really don't.... [I]n a situation like this you don't want to get too close."

Apart from saying that Chandler "never uses the same route twice," Ferguson could not provide information about how Chandler imported cocaine to Ketchikan. When asked, "Does Chandler ever bring it back on his plane? Airplane? Alaska Airlines?" Ferguson answered, "Not that I know of." When asked, "So how does he bring it back in," she replied, " ... it might be on his plane." Ferguson said she had "no idea" where Chandler would land his plane when he flew to the Seattle area for drugs. Asked, "And he'll bring back maybe a pound at a crack," Ferguson answered only "Uh huh."

Ferguson provided no further details as to Chandler's dealings in her August 25 interview.

In determining the extent to which this information could contribute to a finding of probable cause, we follow the two-pronged *Aguilar–Spinelli* analysis,[5] considering first whether Ferguson's statements could be deemed truthful and, second, whether they could be deemed reliable—that is, whether they were sufficiently detailed or corroborated to permit the inference that Ferguson spoke from personal knowledge. *See State v. Jones,* 706 P.2d 317, 324 (Alaska 1985); *Kvasnikoff v. State,* 804 P.2d 1302, 1306–07 (Alaska App.1991).

The state did not provide any evidence below directly bearing on Ferguson's credibility—the first prong of the *Aguilar–Spi-*

---

4. In this regard, however, Ferguson did indicate that she had known the other two men for the past ten years but had not known Chandler for as long a period.

5. See *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

*nelli* analysis. Judge Jahnke nevertheless found that Ferguson's admission that she had once been furnished two ounces of cocaine by Chandler amounted to a statement sufficiently against Ferguson's penal interest to establish her credibility. Although this finding seems debatable,[6] we may accept it for purposes of this decision.

The second prong of the *Aguilar–Spinelli* analysis deals with reliability, as opposed to credibility, and requires an inquiry into the basis of Ferguson's knowledge. This requirement may be met in either of two ways. First, Ferguson's information could be deemed reliable if it was sufficiently detailed to support the inference that Ferguson spoke from her own personal knowledge, and that her information did not reflect mere speculation or derive from second-hand sources whose credibility could not be ascertained. Alternatively, the reliability of Ferguson's information could be established through the presentation of other evidence corroborating Ferguson's statements. *See Kvasnikoff v. State,* 804 P.2d at 1306–08.

Here, Ferguson told the police that she had once been given two ounces of cocaine by Chandler. This statement obviously purported to be based on her own personal knowledge. Accepting Judge Jahnke's conclusion that Ferguson was truthful, we find that Ferguson's statement set forth credible and reliable information indicating that Ferguson had received two ounces of cocaine from Chandler at some prior time.

In sharp contrast to Ferguson's specific assertion that she had once obtained two ounces of cocaine from Chandler, however, the balance of Ferguson's information regarding Chandler was notably generalized, conclusory, and lacking in detail. None of the information Ferguson gave concerning the frequency of Chandler's dealings in cocaine or his transportation of the drugs from Seattle to Ketchikan was sufficiently detailed or specific to establish that it was based on Ferguson's own observations, as opposed to what she may have heard from others or surmised on her own. Furthermore, from the record it appears that detective Pickrell was aware of no evidence corroborating Ferguson's claim that Chandler was involved in the importation of cocaine to Ketchikan.

Notably, Judge Jahnke's findings on the issue of probable cause did not address the reliability prong of the *Aguilar–Spinelli* doctrine. Judge Jahnke did give detailed consideration to the issue of Ferguson's "reliability" in his findings. However, a review of the court's findings indicates that, under this rubric, Judge Jahnke actually dealt only with the issue of Ferguson's truthfulness and veracity. At no point did the judge attempt to determine whether Ferguson's allegations linking Chandler to the importation of cocaine to Ketchikan were based on first-hand knowledge.

Reviewing the record in its entirety, we have found no contextual detail or corroborating information sufficient to support a reasonable belief that Ferguson spoke from her own personal knowledge in accusing Chandler of regularly importing cocaine. Ferguson's police interview could reasonably have been relied on to establish that Chandler had given Ferguson two ounces of cocaine at some unspecified time in the past; perhaps also that Ferguson may have received lesser amounts at other unspecified times. This information, however, had little bearing on Ferguson's generalized assertion that Chandler regularly imported cocaine, and it also fell far short of amounting to probable cause to believe that Chandler would be in possession of cocaine when he arrived at the Ketchikan airport five weeks after Ferguson's interview.

Chandler's suspicious behavior at the airport, when combined with his dismissed 1986 charges and information concerning his delivery of cocaine to Ferguson, certainly amounted to a reasonable suspicion warranting an investigative stop of Chandler and a limited investigative detention of his

---

**6.** *Compare Shakespeare v. State,* 827 P.2d 454, 457–460 (Alaska App.1992) *with State v. Bian-* *chi,* 761 P.2d 127, 131 (Alaska App.1988).

property. However, the totality of the information available to the officers when they seized Chandler's bag did not approach the level of certainty necessary to establish probable cause. Because the search warrant that led to the discovery of cocaine was the fruit of the unlawful seizure of Chandler's bag, we conclude that the superior court erred in denying Chandler's motion to suppress.

The conviction is REVERSED.