NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

ETHAN RYAN MOORE,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11397
Trial Court No. 3DI-11-210 CR

O P I N I O N

No. 2501 — May 27, 2016

Appeal from the Superior Court, Third Judicial District, Dillingham, Fred Torrisi, Judge.

Appearances: Laurence Blakely, Mendel & Associates, Anchorage, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Mary A. Gilson, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, and Allard, Judge.

Judge MANNHEIMER.

On June 9, 2011, acting on several informants' tips, two police officers stopped Ethan Ryan Moore at the Dillingham airport shortly after he retrieved his two pieces of luggage from baggage claim. The officers told Moore that they believed he was transporting marijuana, and they asked Moore for permission to search his luggage.

Moore, who was on his way to Togiak, declined to consent to this search. The officers then seized both pieces of Moore's luggage, transported them to the Dillingham police station, and contacted the local magistrate to apply for a search warrant.

After hearing the warrant application, the magistrate concluded that there was no probable cause for the search, so he refused to issue the search warrant. More specifically, the magistrate concluded that the officers had failed to provide sufficient proof of their informants' credibility to satisfy the *Aguilar-Spinelli* test. [1]

When the magistrate issued this ruling, he invited the officers to present more information to corroborate their informants.

But the officers did not present more information to the magistrate and ask him to reconsider his decision. Nor did the officers acquiesce in the magistrate's decision and return Moore's luggage to him. Instead, the officers kept Moore's luggage overnight and then, the next morning, they shipped it to the Alaska State Troopers in Anchorage. After the luggage arrived in Anchorage, it was subjected to sniffing by a drug-detection dog. The dog alerted to the luggage, and the troopers then applied for a search warrant, this time in front of an Anchorage judge. The warrant was granted.

The ensuing search of Moore's luggage disclosed seven vacuum-sealed bags of marijuana totaling approximately seven ounces. Based on the discovery of this marijuana, Moore was charged with, and later convicted of, fourth-degree controlled substance misconduct. [2]

---

[1]   *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *See State v. Jones*, 706 P.2d 317, 322-25 (Alaska 1985) (holding that, as a matter of state law, the *Aguilar-Spinelli* test continues to govern the evaluation of hearsay information offered to support a search or seizure).

[2]   AS 11.71.040(a)(3)(F) (possession of four ounces or more of marijuana).

In this appeal, Moore argues that, after the Dillingham magistrate refused to issue the search warrant, it was illegal for the Dillingham officers to retain his luggage overnight and then ship it to Anchorage — and that all of the ensuing investigative efforts (the dog sniff and the second search warrant application) were tainted by this illegality.

For the reasons explained in this opinion, we agree with Moore, and we therefore reverse his conviction.

### *The State's contention that the Dillingham officers needed only reasonable suspicion to hold Moore's luggage overnight and then ship it to Anchorage for further investigative inspection*

Moore does not contest that the Dillingham officers had reasonable suspicion to believe that he was carrying marijuana for commercial purposes — and that the officers therefore had the authority to temporarily seize his luggage so that they might apply for a search warrant. *See Pooley v. State*, 705 P.2d 1293, 1307 (Alaska App. 1985); *LeMense v. State*, 754 P.2d 268, 272-73 (Alaska App. 1988).

But Moore argues that the officers exceeded their authority when they retained his luggage overnight and then shipped it to Anchorage for further investigative efforts. The State, in turn, responds that the officers were simply pursuing the most prompt investigative efforts that were available to them under the circumstances, since there were no drug-sniffing dogs in Dillingham.

To resolve these arguments, we must examine and more clearly define the scope of police authority to conduct temporary investigative seizures of travelers' luggage based on reasonable suspicion.

The United States Supreme Court discussed the limits that the Fourth Amendment places on temporary investigative detentions of luggage in *United States v. Place*, 462 U.S. 696, 708-710; 103 S.Ct. 2637, 2645-46; 77 L.Ed.2d 110 (1983).

In *Place*, the Supreme Court firmly rejected the government's argument that temporary investigative seizures of travelers' luggage could be more intrusive — *i.e.*, of greater scope and duration — than investigative seizures of travelers themselves:

> The premise of the Government's argument is that seizures of property are generally less intrusive than seizures of the person. While true in some circumstances, that premise is faulty on the facts ... in this case. The precise type of detention we confront here is seizure of personal luggage from the immediate possession of [a] suspect for the purpose of arranging exposure to a narcotics detection dog. Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. ... Nevertheless, such a seizure can effectively restrain the person[,] since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return. Therefore, when the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause.

*Place*, 462 U.S. at 708-09, 103 S.Ct. at 2645.

Although the Supreme Court "decline[d] to adopt any outside time limitation for a permissible [investigative] stop", the Court noted that it had "never

approved [an investigative] seizure of the person for the prolonged 90-minute period" that was presented in *Place* — and the Court then ruled that this 90-minute detention of Place's luggage violated his Fourth Amendment rights. *Id.*, 462 U.S. at 709-710, 103 S.Ct. at 2646.

This Court first addressed the permitted scope of investigative seizures of luggage in *Peschel v. State*, 770 P.2d 1144 (Alaska App. 1989). In *Peschel*, we concluded that the reasonableness of the investigative seizure — its scope and duration — should be evaluated using a multi-factor test:

- the length of the detention;
- whether the traveler was forced to choose between interrupting their journey (to remain with their luggage) or continuing their journey without their luggage;
- whether the police gave the traveler an adequate explanation of where they were taking the luggage, and when and how it would be returned;
- whether the police acted diligently in pursuing their investigation during the period of detention; and
- whether the police used "the least intrusive means possible" when conducting their investigation.

*Peschel*, 770 P.2d at 1147-48.

In Moore's case, the first two factors clearly favor his position that the detention of his luggage was unlawful. The police kept his luggage for close to 24 hours — substantially longer than the 90 minutes that was disapproved in *Place*. And Moore was forced to continue traveling to his destination (Togiak) without his luggage.

The State, for its part, focuses on the other three factors.

When the Dillingham officers spoke to Moore at the airport, they told him that they were going to send his luggage to Anchorage so that it could be subjected to a

drug-sniffing dog. The officers also informed Moore that they could not ship his luggage to Anchorage until the next day.

On this issue, we note that the officers gave Moore no estimate of when or how his luggage might be returned to him. They merely assured Moore that his luggage would ultimately be returned.

But more importantly, even though the police may have accurately informed Moore that they were going to ship his luggage to Anchorage, and that he would be deprived of his luggage at least until the next day, the fact that the police communicated this information to Moore could not turn an unconstitutional seizure into a lawful one. In other words, the police could not obtain a license to violate Moore's Fourth Amendment rights merely by informing Moore that they intended to do so.

We turn, then, to the diligence of police investigation, and whether the police used the least intrusive means possible to pursue their investigation while they had Moore's luggage in their possession. Regarding these two factors, the State relies heavily on the fact that there were no drug-sniffing dogs in Dillingham, and that the closest drug detection dogs were in Anchorage. The State argues that, practically speaking, there was no way for the police to pursue their investigation other than detaining Moore's luggage for nearly a day, and shipping it hundreds of miles away.

But in *Chandler v. State*, 830 P.2d 789, 791-92 (Alaska App. 1992), we rejected the argument that the duration and scope of a "temporary" investigative detention of luggage could be expanded to accommodate whatever investigative measures might be needed under the circumstances.

In *Chandler*, based on reasonable suspicion, the police transported Chandler's bag from the Ketchikan airport to the police station, where the officers prepared the paperwork to obtain a search warrant. The search warrant was issued slightly more than 90 minutes after the police seized Chandler's bag. *Id.* at 791.

We concluded that this 90-minute detention of the bag violated Chandler's rights under the Fourth Amendment. *Id.* at 792. In reaching this conclusion, we explained that even though there was no strict time limit for investigative detentions, "[a]t some point, ... the length of [the] detention alone" will preclude any claim that the police seizure of the luggage detention constituted only a temporary investigative detention (*i.e.*, the kind of limited detention that can be justified by reasonable suspicion rather than probable cause). *Ibid.*

In *Chandler*, we did not suggest that the police displayed a lack of diligence in applying for the search warrant. Rather, we held that the length of the detention, coupled with the fact that the police removed the defendant's bag from the airport, meant that the seizure and detention of the bag could no longer be justified merely by reasonable suspicion:

> Chandler's bag was ... seized directly from Chandler's possession. The bag was not merely immobilized at the point of seizure. Rather, it was transported a significant distance from the airport to the Ketchikan police station. The police mitigated the intrusiveness of this 90-plus minute detention by telling Chandler where they were taking his bag, their purpose in taking it, the approximate length of time that it would be held, and how Chandler could reclaim it. [But though] such measures might make the difference in a borderline case, they do not convert the kind of seizure that occurred here into a brief, minimally intrusive detention of property. We conclude that the warrantless seizure required probable cause.

*Chandler*, 830 P.2d at 792.

We reach the same conclusion in Moore's case. It was unlawful for the Dillingham police to hold Moore's luggage overnight and then ship the luggage to Anchorage for further investigative measures, based merely on reasonable suspicion.

> *The State's argument that the Dillingham officers <u>had</u> probable cause to believe that Moore's luggage contained marijuana intended for commercial purposes, and thus the officers were authorized to hold the luggage overnight and then ship it to Anchorage for the dog sniff*

The State argues that even if the actions of the Dillingham police exceeded the type of temporary investigative detention that would be authorized based on reasonable suspicion, their actions were nevertheless justified because the Dillingham officers actually had probable cause to believe (as opposed to mere reasonable suspicion) that Moore was transporting marijuana for commercial purposes.

When the police have probable cause to believe that an article of luggage contains evidence of a crime, and when there are no exigent circumstances authorizing an immediate warrantless search, the police are authorized to seize the luggage (but not search it) and to carry the luggage away for safe-keeping while they apply for a search warrant. [3]

But the State's argument in Moore's case goes considerably beyond this proposition of law. The State is effectively arguing that if the police have probable cause to believe that an article of luggage contains evidence of a crime, the police may seize the luggage, hold it for as long as is reasonably necessary to complete any desired additional investigation or testing, and even ship the luggage hundreds of miles to

---

[3]  *United States v. Chadwick*, 433 U.S. 1, 13; 97 S.Ct. 2476, 2484-85; 53 L.Ed.2d 538, 551 (1977); *Metcalfe v. State*, 593 P.2d 638, 640 (Alaska 1979).

accomplish this additional investigation or testing — all without seeking a judicial warrant until the additional investigation is done.

We are aware of no legal authority to support this argument.

There are two additional problems with the State's probable cause argument in Moore's case.

First, the Dillingham police *did* promptly seek a search warrant — and it was refused. The State cites no authority for the proposition that the police could ignore this adverse judicial ruling, continue to hold the luggage, ship it away to Anchorage for further testing, and then apply for a search warrant again in front of a different judge. Yet this is essentially what the State is arguing in Moore's case.

The State contends that the issue currently before this Court is whether to affirm the trial judge's ruling that the police had probable cause when they seized Moore's luggage. But even if the Dillingham police had probable cause to *seize* Moore's luggage, the officers were only authorized to hold the luggage long enough to secure a search warrant. Thus, the question presented here is whether the Dillingham magistrate should have issued the requested search warrant.

In litigating this question, the State is not allowed to rely on information that was adduced after-the-fact. [4] And the State acknowledges that the evidence obtained in Anchorage (the "alert" of the drug-detection dog) should not be considered when assessing whether the Dillingham police had probable cause when they applied for the search warrant. But the State nevertheless relies on police testimony that was adduced later, at the evidentiary hearing on Moore's motion to suppress.

---

[4] *State v. Jones*, 706 P.2d 317, 326 (Alaska 1985); *State v. White*, 707 P.2d 271, 277 (Alaska App. 1985); *United States v. Anderson*, 453 F.2d 174, 177 (9th Cir. 1971).

This evidentiary hearing testimony offered a fuller description of the information that was known to the Dillingham police when they initially applied for the search warrant. But to the extent that this testimony supplemented the information presented to the Dillingham magistrate, it is irrelevant to our review of the magistrate's decision — because the law requires that all of the information supporting the issuance of a search warrant be contained "within the four corners" of the affidavits or testimony presented in the search warrant application. [5]

Turning to the contents of the Dillingham search warrant application, the warrant application was primarily based on information obtained from three informants. Adhering to the *Aguilar-Spinelli* test, the Dillingham magistrate questioned the police about how these three informants obtained their information, why these informants chose to share this information with police, and whether these informants had proved reliable in the past.

Two of the informants were anonymous; that is, the police did not disclose their identities to the magistrate.

When the magistrate asked the officer how the first anonymous informant obtained his information, the officer replied, "I don't have any answers for that." When the magistrate asked the officer if he knew why the first anonymous informant had wanted to share his information with the police, the officer replied, "No, I do not." And when the magistrate asked the officer if this first anonymous informant was from the criminal milieu, the officer replied that, as far as he knew, the informant had no history of drug activity, but the informant's "significant other" did.

---

[5]    *State v. White*, 707 P.2d 271, 277 (Alaska App. 1985); *United States v. Anderson*, 453 F.2d 174, 177 (9th Cir. 1971).

With regard to the second confidential informant, the officer told the magistrate that he had "the impression" that this second informant had personally witnessed one or more marijuana sales by Moore. But when the magistrate asked the officer if this second anonymous informant had given the police any idea how recently these sales were supposed to have occurred, the officer replied, "No, he did not." The officer also conceded that "[t]he reliability of this person has not been established."

The third informant was identified by name. She had no direct information about Moore, but she claimed to know the drug-transportation methods used by another man who was alleged to be Moore's accomplice. When the magistrate began asking more questions about this third informant, the officer volunteered that this informant had given her information to the police when she was "contact[ed] for alcohol importation" approximately nine months earlier. The magistrate asked the officer, "So [this third informant] was being accused of importing alcohol? ... Why would she be providing that kind of information to you, do you know?" The officer replied that "she provided [the investigating officer] with that information ... to [distract] him from his contact with her." The magistrate asked, "[So] she was trying to point the finger at somebody else, to take the focus off of her — is that kind of what you're thinking?" And the officer answered, "Yes — or to try to, you know, sort of make a deal."

After hearing this testimony, the magistrate concluded that the police had failed to adequately establish the credibility or reliability of their informants under the *Aguilar-Spinelli* test. Based on this record, we can not say that the magistrate's decision constituted an abuse of discretion. [6]

---

[6] We could not find any prior case where this Court was called upon to review a magistrate's decision *not to issue* a search warrant. But in cases raising the related issue of whether a magistrate was correct in *issuing* a search warrant, this Court has employed an

(continued...)

2501

We therefore hold that the police violated Moore's rights under the Fourth Amendment when they continued to hold his luggage after the magistrate denied their application for a search warrant. All evidence derived from the later search of that luggage must be suppressed.

*Conclusion*

The judgement of the superior court is REVERSED.

---

[6] (...continued)
"abuse of discretion" standard of review. *See McClelland v. State*, 928 P.2d 1224, 1225 (Alaska App. 1996); *State v. Bianchi*, 761 P.2d 127, 129-30 (Alaska App. 1988).