**Michael P. SHAKESPEARE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3294.**

Court of Appeals of Alaska.

March 6, 1992.

Margaret W. Berck, Asst. Public Defender, Juneau and John B. Salemi, Public Defender, Anchorage, for appellant.

Eric A. Johnson, Office of Sp. Prosecutions and Appeals, Anchorage and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

Michael P. Shakespeare was convicted by a jury of Misconduct Involving a Controlled Substance in the Third Degree for possessing cocaine with intent to deliver. AS 11.-71.030(a)(1). He appeals his conviction on several grounds. We reverse.

Shakespeare was arrested along with several other individuals on November 24, 1988. The arrests stemmed from an investigation conducted by Juneau and Ketchikan police into a cocaine distribution organization based in Seattle and headed by Patty Hunt. November 24 marked the culmination of this investigation, as it was the date set for a large, undercover purchase of cocaine orchestrated by police in an attempt to draw Hunt personally to Alaska. To monitor the transaction, the police posted officers at the Seattle and Juneau air-

* Sitting by assignment made pursuant to article   IV, section 16 of the Alaska Constitution.

ports, at the Super 8 Motel in Juneau (where agents had rented rooms and the purchase was to occur), and near a Garnet Street residence in Juneau known to be used by members of the Hunt group.

Police watched Hunt leave the Seattle airport and observed her arrive in Juneau. Hunt was accompanied by Michelle Rowe, a dealer from whom police had previously purchased cocaine. At the airport, Hunt and Rowe were met by Donald Powell, a man known by police to be an integral member of the Hunt organization. Police followed the three to the Garnet Street residence. Soon Shakespeare arrived, driving a Ford Bronco.

Hunt and Powell then left Garnet Street in a red Chevrolet Sprint and drove to the Alpine Apartments, where the group was believed to maintain a safehouse. From there they drove to the parking lot of the Fred Meyer store. Shakespeare and Rowe arrived a short time later in Shakespeare's Bronco. Hunt and Rowe switched vehicles, so that Hunt was with Shakespeare in the Bronco, and Rowe was with Powell in the Sprint.

The two cars left the parking lot and drove toward the Super 8 Motel. Powell and Rowe stopped at the motel; Hunt and Shakespeare continued to drive, apparently monitoring the area for police activity. Rowe entered the motel and spoke with an undercover agent regarding the cocaine sale. Originally, the agent had agreed to buy a pound of cocaine in a single transfer. However, Rowe informed the agent that her source wanted to stagger the delivery. She offered to deliver one ounce immediately with the remainder to follow in two installments. The agent agreed and handed Rowe $1600. Rowe went out to the Sprint and returned with an ounce of cocaine. The agent gave Rowe $10,000, and Rowe agreed to return with seven ounces.

Rowe and Powell left the motel and joined Shakespeare and Hunt at the Fred Meyer parking lot. There, Hunt and Rowe got into a heated argument about the price of the cocaine and whether to continue the transaction. The two women again changed cars. Hunt left with Powell and

travelled to the Alpine Apartments, then returned to Fred Meyer, rejoining Rowe and Shakespeare. Hunt and Rowe changed cars again, and both cars left the parking lot.

Rowe and Powell returned to the Super 8 Motel, where Rowe gave the undercover agent more cocaine. The agent gave Rowe more money, and Rowe agreed to return with the final installment. Rowe and Powell were arrested as Rowe left the motel.

Meanwhile, police had arrested Shakespeare and Hunt near the Fred Meyer parking lot. Officers observed a large amount of cash (later found to total $1600) on the floor of the truck in front of the passenger seat. During an inventory search of the car, police found a bag containing cocaine and an additional $10,000 in cash.

Shakespeare testified on his own behalf at trial. He did not dispute the observations made by the police on the night of November 24. Rather, Shakespeare maintained that he was an unwitting accomplice to the Hunt scheme. He claimed that he had returned to Juneau on the night of the 24th from a week at Green's Creek, that he had heard that Hunt—an old childhood friend—was in town, and that he had sought her out, hoping to obtain a loan.

Shakespeare claimed that as he drove Hunt around, they reminisced about old times while Hunt smoked marijuana and directed him from one place to the next. He denied knowing that a drug transaction was occurring until he overheard the argument between Hunt and Rowe during the second meeting in the Fred Meyer parking lot. At that point, Shakespeare claimed, he wanted to leave, but could do so only after calming Rowe, with whom he had been left by Hunt. Shakespeare testified that he did not know that contraband was in his car until Hunt told him shortly after the police signalled for him to stop.

During the investigation that followed the November 24 arrests, the police discovered evidence linking Shakespeare's wife, Yvette, to a cocaine purchase from one of Hunt's dealers in Juneau. A ledger entry indicated that Yvette owed $800 for the

buy. Police interviewed Yvette in early December, 1988. During the interview, Yvette acknowledged a prior purchase of cocaine. Yvette also stated that Shakespeare had introduced her to Hunt, that he was aware that Hunt was a "big time" drug dealer, and that he had arranged Yvette's purchase of cocaine from the Hunt organization.

At trial, the state sought to question Yvette about these statements in order to establish that Shakespeare knew of Hunt's involvement in drug activity prior to November 24. Shakespeare, however, asserted the spousal privilege. *See* Alaska Rules of Evidence 505; 512(b).[1] Superior Court Judge Duane K. Craske upheld the assertion.

■ The state then sought to present Yvette's statements through the testimony of Juneau Police Officer Clarence Bloodworth, who had interviewed her. Shakespeare objected on grounds of hearsay. In response, the state argued that Bloodworth's testimony was admissible under the statement against interest exception to the hearsay rule, A.R.E. 804(b)(3), or, alternatively, under A.R.E. 804(b)(5), the residual exception clause. Judge Craske agreed with the state and allowed Bloodworth to testify. On appeal, Shakespeare argues that admission of this evidence was error.

The admissibility of evidence is largely within the discretion of the trial court; we will not disturb an evidentiary ruling absent an abuse of discretion. *Wortham v. State*, 689 P.2d 1133, 1140 (Alaska App. 1984).

Alaska Rule of Evidence 804(b)(3) provides:

(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) *Statement Against Interest.* A statement which was at the time of its

making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The statement against interest exception rests on the assumption "that persons will not make damaging statements against themselves unless they are true." J. Weinstein and M. Berger, 4 *Weinstein's Evidence* ¶ 804(b)(3)[01], at 804–123 (1991). The validity of this assumption becomes questionable, however, when a statement is against the declarant's interest only in a literal sense—that is, when the objective circumstances surrounding the giving of the statement make it clear that a reasonable person in the declarant's shoes would have perceived little actual risk of danger or disadvantage from the statement, regardless of its truth. In recognition of this point, A.R.E. 804(b)(3) expressly requires a statement to be "so far contrary" to the interest of the declarant at the time of its making "that a reasonable man in his position would not have made the statement unless he believed it to be true."

Thus we have held that where the declarant is aware that he is not subject to prosecution for crimes revealed in a statement, the statement lacks trustworthiness and should not be construed as one against penal interest. *Wortham v. State*, 689 P.2d at 1140. *See also Garroutte v. State*, 683 P.2d 262, 266 (Alaska App.1984). Further, we have recognized that statements given in the context of a plea bargain, where the defendant may have an incentive to implicate others, are inherently suspect

1. From the record, it is difficult to ascertain whether Shakespeare invoked the spousal immunity privilege, A.R.E. 505(a), the confidential marital communications privilege, A.R.E. 505(b), or both. The state now questions the validity of the trial court's ruling insofar as it

held that the confidential communications privilege applied. However, the state did not object to the court's grant of the privilege when it was asserted. We therefore assume, without deciding, that Judge Craske correctly ruled on the privilege issue.

and not subject to the statements against interest exception. *Newcomb v. State,* 779 P.2d 1240, 1242–43 (Alaska App.1989).

In the present case, Officer Bloodworth testified about the circumstances surrounding the interview in which Yvette implicated Shakespeare. He stated that Yvette was initially reluctant to answer questions and was persuaded to talk openly only by assurances that her statements would not be held against her. Bloodworth candidly testified:

> She was very concerned about her probation being revoked because of her involvement with cocaine. So she started out not wanting to tell us the truth. She told us that she borrowed the money from Patty Hunt and that was all there was to it. But we convinced her that we weren't going to take any action against her if she told us the truth.
>
> . . . .
>
> . . . I asked her the one thing that I think turned it around, is John or I, one of us, asked her whether she believed she'd go back to jail and she said yes. And then John, I think, talked to her and said, you know, we're not interested in prosecuting you. What we're interested in is the information you have about Patty Hunt. And at that point she believed that we weren't going to throw her in jail if she started telling us the truth.

From this testimony it is evident that when Yvette made the disputed statements, she believed that she was not subject to prosecution.

The state argues that Yvette's belief is irrelevant, since no formal immunity agreement was entered into between Yvette and the state. However, even if we assume that the promises made by the interviewing officers did not bind the state—an issue expressly left undecided by the supreme court in *Closson v. State,* 812 P.2d 966, 971 n. 6 (Alaska 1991)—this does not end the inquiry. Rule 804(b)(3) requires us to focus upon whether the statement so far tended to subject Yvette to criminal liability that a reasonable person in her position would not have made the statement unless she believed it to be true. Under this formula, the crucial inquiry is not whether the police had authority to confer immunity or whether a formal immunity agreement was reached; rather, the inquiry is whether a reasonable person in Yvette's shoes would have believed that the police would not prosecute.

We believe that a reasonable person would have construed the interviewing officers' assurances as a promise against prosecution and would not have perceived the disputed statements as being against penal interest. Bloodworth's testimony expressly confirms this conclusion. According to Bloodworth, Yvette did not begin to talk openly until she became convinced she would not jeopardize herself by doing so. It follows that the rationale of A.R.E. 804(b)(3) does not apply to Yvette's situation.

Our conclusion finds ample support from other jurisdictions. In *United States v. Magana–Olvera,* 917 F.2d 401 (9th Cir. 1990), the state sought to admit statements made during the in-custody interrogation of an accomplice who implicated himself and the defendant in drug activity. The accomplice indicated a willingness to cooperate with the government; the interviewing officer intimated a corresponding leniency in prosecution. The court found that a reasonable person in the declarant's shoes may have made the statements even if they were not true. The court stated that the declarant had "a powerful incentive to minimize the damage of an almost certain criminal conviction. That incentive becomes nearly irresistible when the [interviewing officer] uses a federal indictment as a stick, and a promise of leniency as a carrot." *Id.* at 407–08.

In *United States v. Boyce,* 849 F.2d 833, 836 (3d Cir.1988), the court overturned the admission of statements, made by a codefendant while in custody and prior to consultation with an attorney, which implicated both himself and the defendant. The court found that since nothing in the record indicated that the declarant "was not motivated by a desire to curry favor with the FBI agent and police officer interrogating him," the statements were unreliable and

not admissible as statements against interest. *See also United States v. Johnson,* 802 F.2d 1459, 1464–65 (D.C.Cir.1986); *State v. Hansen,* 312 N.W.2d 96, 101 (Minn.1981); *State v. Whelchel,* 115 Wash.2d 708, 801 P.2d 948 (1990).

Judge Craske based the admission of Yvette's statements upon a determination that the statements were in fact trustworthy—a determination that he made after listening to an audiotape of the interview:

> My original feeling kind of (indiscernible), and I really have changed my mind—was going to change my mind, frankly, but the range of the discussion and her commentary, I think she was genuinely trying to I suppose protect herself, say—say what she needed to say, and that she was under pressure on the one hand to be indicted; on the other hand to have the probation revoked, she was going both directions. But I think she was under that kind of punitive pressure that would cause a reasonable person in her position to make the statement to be true. She—the officers had said that they knew everything about it, which is the typical officer's gambit, I suppose, and—but that's what they said. And they—her sincerity and trustworthiness, I think, came from her own state of mind of fear.

The error in this approach is the substitution of a subjective analysis of the trustworthiness of Yvette's statements for the objective analysis of the circumstances surrounding the making of the statements, which is required by Rule 804(b)(3). As we noted above, a reasonable person in Yvette's position would have thought that the assurances offered by the police immunized the declarant against prosecution stemming from the statements. In such a context, fear and self-interest are as likely to induce dishonest responses as truthful ones.

Here, the possibility that Yvette's statements were motivated by fear and self-interest stems not only from the assurances of immunity from prosecution that the police gave in return for cooperation, but also from the possible revocation of Yvette's probation if Yvette did not cooperate. At trial the following exchange occurred between Shakespeare's counsel and Bloodworth:

Q: And what exactly did you say or overhear said to her about probation revocation?

A: That we were not interested in revoking her probation. . . .

Q: And she expressed serious concern that her probation would be revoked?

A: Yes.

Q: Okay. Isn't it a fact that during that conversation that the interviewing officer said that he could go and talk to Diane Shriner, the probation officer and that it would go either way, depending on what Yvette said to him?

A: I don't remember him saying that. I remember him saying that he would be happy to call her and tell her that Yvette had cooperated with us.

In *Newcomb v. State,* 779 P.2d at 1242–43, citing the Commentary to A.R.E. 804(b)(3), we recognized that statements which inculpate others and are given in the context of plea bargaining are inherently unreliable. The unreliability stems from the fact that one who has been placed in the position of bargaining with the government, particularly when liberty is at stake, has every incentive to inculpate others for personal benefit.

There is little distinction between a typical plea bargain situation and the situation Yvette was in when questioned by Bloodworth. Yvette had the option of giving the officers information they wanted against Shakespeare (as to which she had been assured immunity), or risking the negative ramifications of silence: a threatened probation revocation action. Under these circumstances, Yvette's statements implicating Shakespeare were no more dependable than the statements we found untrustworthy in *Newcomb.* In both cases, the declarant had a strong incentive to give damaging information against others, regardless of whether the information was truthful.

Indeed, we note that a strong argument has been made that all statements given

during a police interrogation which implicate both the declarant and the accused should categorically be excluded from the statement against interest exception to the hearsay rule, because such statements always involve a great danger that the declarant may be motivated by an express or implied threat of prosecution or promise of leniency. J. Weinstein and M. Berger, 4 *Weinstein's Evidence* ¶ 804(b)(3)[03], at 804–150 (1991). This is one factor that led the original drafters of Federal Rule 804(b)(4) to include the following clause in the statement against interest exception:

> This exception does not include a statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused.

*Id.* Eventually, this language was deleted from the rule on the basis that it was not needed, which, according to Weinstein, "means that the Rule should be interpreted to include this language." *Id.* at 804–151.[2]

Finally, we note that there are other circumstances in this case undermining the trustworthiness of Yvette's statements. Officer Bloodworth testified that, during the interview, Yvette attached "a great deal of blame for her difficulties upon [Shakespeare]," and that this struck him as "self-serving." Bloodworth acknowledged that Yvette gave inconsistent statements during the interview. Also, at the time of the interview, Yvette and Shakespeare were apparently experiencing marital difficulties and had separated. Given the totality of the circumstances surrounding Yvette's police interview, we are unable to say that a reasonable person in her position "would not have made the statement unless [she] believed it to be true." A.R.E. 804(b)(3). Accordingly, we conclude that the trial court abused its discretion by admitting evidence of Yvette's statement under the statement against interest exception.

Judge Craske alternatively ruled that even if Yvette's statements were not admissible under A.R.E. 804(b)(3), their admission was warranted under A.R.E. 804(b)(5). Rule 804(b)(5) is a residual provision, which allows the admission of hearsay statements not otherwise admissible under an enumerated exception. This residual exception, however, is one of rare application and is not meant to be used as a catch-all for the admission of statements falling just outside the borders of recognized exceptions. *Brandon v. State*, 778 P.2d 221, 227 (Alaska App.1989). Under A.R.E. 804(b)(5) an independent analysis must be undertaken to see if the case involves "exceptional circumstances where the court finds guarantees of trustworthiness equivalent to or exceeding the guarantees reflected in the present exceptions to the hearsay rule." *Id.* The finding of trustworthiness upon which admission of the statement is predicated is not a procedural formality; it is a substantive requirement. *Rychart v. State*, 778 P.2d 229, 233 (Alaska App.1989). Here, we have found Yvette's statement inadmissible under A.R.E. 804(b)(3) precisely because it lacked circumstantial indicia of trustworthiness. This lack of trustworthiness necessarily precludes the statement's admission under A.R.E. 804(b)(5).

At trial, Shakespeare's defense was based on his claimed lack of knowledge of the events transpiring around him. Yvette's hearsay statement directly undercut this defense, indicating that Shakespeare knew that Hunt was a cocaine dealer and that he had bought drugs from her in the past. The admission of the hearsay statement thus cannot be dismissed as harmless error and requires reversal of Shakespeare's conviction.

We briefly address Shakespeare's remaining contentions. Shakespeare claims that the trial court erred in admitting the two packages of cocaine that Mi-

---

**2.** Some states have nonetheless retained the provision in the text of their rules. *See* Ark.Stat. Ann. § 28–1001 Uniform Rules of Evidence, Rule 804(b)(3) (Noncum.Supp.1976); Fla.Stat. Ann. Evidence Code § 90.804(2)(c) (Supp.1976); Nev.Rev.Stat. tit. 4 § 51.345 (1973) *as amended by* A 1979, 44; N.D.Rules of Evidence, Rule 804(b)(3) (1977); Vt.Rules of Evidence, Rule 804(b)(3) (1983).

chelle Rowe delivered to the undercover officers at the Super 8 Motel. The cocaine was clearly relevant, since Shakespeare claimed that he had no knowledge of the illicit nature of his actions, and the cocaine served as circumstantial evidence having some tendency to support the inference that he did in fact know that contraband was being exchanged. *See Denison v. Anchorage*, 630 P.2d 1001, 1003 (Alaska App. 1981). Further, the evidence was not unduly prejudicial. At trial, police offered a verbal description of the seized cocaine. The admission of the physical evidence served merely as incremental proof of the nature of the contraband. Judge Craske did not abuse his discretion by admitting the two cocaine packages.

■ Finally, Shakespeare argues that the trial court erred in denying his motion for a judgment of acquittal. Shakespeare claims that the state failed to present sufficient evidence to establish that he possessed the requisite mental state of the offense. However, at trial, the state offered undisputed evidence that on the night of November 24, 1988, Shakespeare was present throughout the various stages of a large and complex drug sale. The state's evidence further showed that cocaine and cash totalling $11,600 were found in Shakespeare's car. Viewing this evidence in the light most favorable to the state, a jury could easily infer that Shakespeare had knowledge that he was facilitating a drug transaction and that he knowingly possessed cocaine. Since reasonable persons could differ as to whether guilt had been established beyond a reasonable doubt, *see Adams v. State*, 598 P.2d 503, 509 n. 8 (Alaska 1979), the trial court did not err by denying Shakespeare's motion for judgment of acquittal.

■ The conviction is REVERSED.[3]

MANNHEIMER, J., not participating.

---

**3.** Shakespeare raises a number of additional issues *pro se*. He first argues that the admission of Yvette's statements violated his spousal immunity and marital communications privileges. We note that since Yvette's interview was conducted after Shakespeare's arrest, it could conceivably be viewed as a stage of an "action[ ], case[ ], and proceeding[ ]" to which the privileges apply. *See* A.R.E. 101(b); *Walstad v. State*, 818 P.2d 695, 698 (Alaska App.1991). However, Shakespeare failed to object to admission of the statements on this basis. In any event, Shakespeare's claim is rendered moot by our decision that the statements were inadmissible hearsay.

Second, Shakespeare challenges the sufficiency of the indictment. Shakespeare raises this issue for the first time on appeal, and we will therefore not consider it. *Anthony v. State*, 521 P.2d 486, 496 (Alaska 1974).

Third, Shakespeare claims a denial of due process because the state failed to preserve and present him with an audiotape of a second police interview with Yvette. Shakespeare's claim is groundless, as the record does not support the inference that such a tape ever existed.

Finally, Shakespeare claims that the trial court erred by admitting cumulative evidence. In light of our disposition of this case on the hearsay issue, we need not decide Shakespeare's cumulative evidence claim.