**Lance D. LINTON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4834.**

Court of Appeals of Alaska.

Aug. 26, 1994.

---

Dick L. Madson, Law Offices of Dick L. Madson, Fairbanks, for appellant.

Eric A. Johnson, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Lance D. Linton was convicted of first-degree murder by a jury. Linton appeals, contending that the trial court erred in admitting hearsay evidence at trial and in denying Linton's pretrial motions to suppress evidence and to dismiss his indictment. We affirm.

## FACTS

In 1972, Linton married Elfriede Goltz in Germany, where Linton was stationed with the Army. In the years that followed, Linton and Elfriede had two children. Linton was eventually transferred to Fort Wainwright, Alaska. In 1980, as a means of obtaining a hardship discharge, Linton convinced Elfriede to dissolve their marriage and give him sole custody of their children. After the Army discharged Linton, Elfriede joined Linton again; the couple occupied a trailer near Fairbanks. Linton's father, John Linton, and John's domestic partner, Stephen Pieroni, lived in another trailer a short distance away.

By all accounts, Linton's relationship with Elfriede deteriorated after the dissolution of their marriage. In early June of 1982, Elfriede disappeared from home. Because Elfriede had few friends in Alaska, her disappearance drew little attention. After the disappearance, various people, including the police, inquired of Linton about Elfriede's whereabouts. Linton gave conflicting explanations, telling some people that she had gone home to Germany and others that she had run off with another man.

Approximately seven years later, in August of 1989, Linton's father died, apparently of natural causes. Several months afterward, in November of 1989, Pieroni and Lance Linton came under investigation as a result of their involvement in a fraudulent pull-tab scheme. The Alaska State Troopers obtained and executed a search warrant for Pieroni's trailer. Trooper Sergeant James McCann interviewed Pieroni during the search. At the conclusion of the interview, McCann urged Pieroni to contact the troopers if Pieroni had anything else to tell them.

A short time later, Pieroni contacted the troopers with information indicating that Linton had murdered Elfriede in 1982. Among other things, Pieroni reported having a conversation with John Linton one morning in June of 1989, about two months before John's death. According to Pieroni, he and John had been drinking and celebrating Pieroni's birthday the night before the conversation. In the morning, Pieroni noticed that John was upset: "Tears were coming down [John's] face." John said that he had something to tell Pieroni, but "it's going to be rough." John went on to say that "Lance killed Elfie and ... I helped transport the body." Pieroni responded, "what are you telling me this for? I don't want to hear this." John answered, "to get it off my chest. I've got to tell you." Pieroni told John to "just calm down and tell me anything you want."

John then told Pieroni that, in the summer of 1982, Linton had come over in the evening hours and asked to borrow John's van; John asked why, and Linton told him that he needed to transport Elfriede. Linton said that he had poisoned Elfriede by placing cyanide in either her milk or tea. He needed John's help because Elfriede was a large woman. John helped Linton load Elfriede into the van. According to Pieroni, John said that, "[j]ust as they were lifting her into the van her arm flopped out of the wrapper." John also told Pieroni that Linton had buried Elfriede on their property, somewhere behind the trailer. John warned that "if Lance learned [that John told Pieroni] he would kill both of us."

After telling the troopers about his conversation with John, Pieroni agreed to testify before a magistrate for a warrant authorizing electronic monitoring of conversations between Pieroni and Linton. Based on Piero-

ni's testimony, Magistrate John C. Hessin granted the warrant. The troopers subsequently monitored and recorded a telephone call between Pieroni and Linton in which Pieroni brought up the topic of Elfriede's disappearance. During the call, Linton was reluctant to discuss Elfriede but made several arguably inculpatory statements. In particular, when Pieroni informed Linton that he knew Elfriede was "buried out back," Linton became "quite angry" and asked Pieroni, "if that's true, how much do you value your life?"

The troopers later obtained a warrant to search the property around Linton's residence. On June 30, 1990, searchers discovered a human cranium—the upper portion of a skull—embedded in moss in a thickly vegetated area; the cranium had apparently been moved to its resting place by animals long before its discovery. Extensive searching yielded no other evidence. Forensic examination positively identified the cranium as Elfriede's and established that Elfriede had died between five and twenty years previously.

Linton was eventually indicted for first-degree murder. Prior to trial, he moved to dismiss his indictment, contending that the state had presented the grand jury with inadmissible hearsay: Pieroni's testimony relating John Linton's description of the disposal of Elfriede's body and the testimony of several witnesses stating that, prior to her 1982 disappearance, Elfriede had told them she was afraid of Linton. Linton also moved to suppress all evidence derived from the warrant that authorized electronic monitoring of Pieroni's telephone conversation with him, contending that the warrant was issued without probable cause.

Superior Court Judge Niesje J. Steinkruger denied Linton's motions. At trial, much of the disputed hearsay was admitted over Linton's objection, as was the evidence obtained as a result of the contested warrant. Upon conviction, Linton filed this appeal.

1. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

## DISCUSSION

### A. *Suppression*

On appeal, Linton first contends that the trial court erred in failing to suppress evidence seized pursuant to the warrant authorizing electronic surveillance of Pieroni's telephone call to Linton. Linton argues that the warrant was issued without probable cause because the state failed to establish Pieroni's credibility in accordance with the *Aguilar–Spinelli*[1] doctrine.

■ Linton's challenge to the state's failure to establish Pieroni's credibility lacks merit, since it fails to recognize that the *Aguilar–Spinelli* test deals exclusively with situations in which the police seek to obtain a warrant by presenting the magistrate with the hearsay statements of an informant; the truthfulness of a witness who personally appears before the issuing magistrate and testifies under oath need not be corroborated under the *Aguilar–Spinelli* test. *See Kvasnikoff v. State*, 804 P.2d 1302, 1306 n. 3 (Alaska App.1991); *Hodsdon v. State*, 698 P.2d 1224, 1226–27 (Alaska App.1985).

> As with any other similarly situated witness, the informant's willingness to submit to an oath, and his personal presence and the availability for questioning by the magistrate provided adequate procedural safeguards to assure a sound basis for assessing veracity and reliability. No independent corroboration was required under the circumstances.

*McLaughlin v. State*, 818 P.2d 683, 686 (Alaska App.1991).

■ Here, Pieroni appeared personally before Magistrate Hessin and testified under oath in support of the disputed warrant. The magistrate was presented with pertinent information relating to Pieroni's credibility and had an ample basis to determine the truthfulness of his testimony. The magistrate did not abuse his discretion in accepting Pieroni's testimony as credible and in issuing the warrant in reliance thereon.[2]

2. Linton separately argues that the magistrate erred in relying on Pieroni's description of John Linton's statements concerning the disposal of Elfriede's body. Linton contends that his fa-

## B. *Hearsay*

### 1. John Linton's confession

Linton next argues that the trial court erred in admitting the hearsay statement of John Linton via Pieroni's testimony at trial. In allowing Pieroni to testify about John Linton's statement, Judge Steinkruger reasoned that, by telling Pieroni about the assistance he gave his son in the disposal of Elfriede's body, John Linton had essentially admitted committing the offense of tampering with evidence. The judge found this statement to be substantially against John Linton's penal interest and, accordingly, concluded that it was admissible under Alaska Rule of Evidence 804(b)(3) as a statement against penal interest.

### a. *A.R.E. 804(b)(3)*

■ Alaska Rule of Evidence 804(b)(3) creates an exception to the hearsay rule when an unavailable declarant makes

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

On appeal, Linton concedes John Linton's unavailability but disputes the trial court's hearsay ruling on several grounds.

Linton notes that, by the time John Linton made his statement to Pieroni in 1989, approximately seven years had elapsed since Elfriede's death. Linton asserts that the five-year statute of limitations[3] for tampering with evidence had thus expired and that, for this reason, John Linton's statement did not tend to subject him to criminal liability and was not against his penal interest. As a matter of law, however, it is far from clear that the applicable statute of limitations for tampering with evidence had already expired when John Linton made the disputed statement to Pieroni.[4] More to the point, nothing in the record suggests that John Linton was aware of or influenced by the possible expiration of the statute of limitations when he spoke to Pieroni. Nor do we think it fair to say that a reasonable person in John Linton's position, even if aware of the possibility of a statute of limitations defense, would have felt free to speak to others about participating in the disposal of a murder victim's body.

Linton also maintains that John Linton's statements exposed him to no realistic threat of criminal liability, because the statements were made to an intimate companion who was unlikely to divulge them to the authorities. Linton analogizes his situation to that in *Shakespeare v. State*, 827 P.2d 454, 458–60 (Alaska App.1992), where we held A.R.E. 804(b)(3) inapplicable to a statement made to the police by an arrestee admitting participation in a crime and implicating the defendant. In *Shakespeare*, we reasoned that, once an arrest occurs and police questioning begins, the arrestee is likely to see little to lose in admitting the offense and much to gain in falsely implicating another person as an accomplice. *Id.* at 459–60. We concluded that, under such circumstances, it was unrealistic to view the disputed statements as being against the declarant's penal interest. *Id.*

ther's statements were inadmissible hearsay and should have been disregarded. This argument, however, loses sight of the fact that the rules of evidence do not apply in the context of search warrant proceedings. *See* A.R.E. 101(c)(2). Moreover, as we conclude in subsequent portions of this decision, Pieroni's testimony concerning John Linton's statements was not objectionable on hearsay grounds.

3. *See* AS 12.10.010.

4. *See* AS 12.10.020(a). This statute allows an extension of the usual five-year statute of limitations for up to three years for the prosecution of an undiscovered offense that includes a material element of fraud. As the state notes in its brief, the crime of tampering with evidence arguably includes a material element of fraud. *Cf. Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir.1978). It is thus conceivable that John Linton remained vulnerable to prosecution for tampering with evidence when he made his statement to Pieroni.

The situation in the current case is obviously distinguishable from *Shakespeare*, since there is utterly no reason to suppose that John Linton was motivated to fabricate a claim against his own son when he spoke to Pieroni.[5] Moreover, unlike the situation in *Shakespeare*, John Linton had no reason to believe that the information he disclosed to Pieroni was already known to the police.

While it is true that John Linton may not have had much reason to fear that an intimate companion like Pieroni would actually report John Linton's confession to the police, neither did John Linton have any assurance that Pieroni would safeguard his confidences. Most courts have been willing to find a sufficient risk of incrimination under such circumstances to trigger the statement against penal interest exception:

> A relation of trust and confidence between speaker and listener arguably militates against awareness that the making of the statement might be against declarant's interest.... [However], [t]he always-existent possibility of disclosure appears to be enough. In fact, the existence of a friendly relationship is on occasion mentioned as a factor supporting admissibility.

5. Linton suggests that it was Pieroni, not John Linton, who had the strong motivation to fabricate in this case and that, for this reason, additional scrutiny should have been given to his testimony before it was admitted. In evaluating the reliability of out-of-court declarations for hearsay purposes, however, the proper focus is on the motivations of the out-of-court declarant, not on the witness who testifies about the out-of-court statement. Because the person who witnesses the out-of-court statement appears personally, testifies under oath, and is subject to cross-examination, the jury can gauge for itself the truthfulness of the witness' claims: "The fact that the witnesses to [the] statements ... may be unreliable or motivated by selfish interests is irrelevant to evaluation of the reliability of the [out-of-court] statements themselves." *Broderick v. Kings Way Assembly of God Church*, 808 P.2d 1211, 1220 (Alaska 1991). *See United States v. Seeley*, 892 F.2d 1, 3 (1st Cir.1989); *United States v. Katsougrakis*, 715 F.2d 769, 777 (2d Cir.1983); *United States v. Atkins*, 558 F.2d 133, 135 (3d Cir.1977). *See generally*, 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 804(b)(3)[02] at 804–147–48 (1994).

To the extent Linton suggests that additional scrutiny should be given to statements against

2 John W. Strong, *McCormick On Evidence* § 319 at 345–46 (4th ed. 1992) (footnotes omitted). *See, e.g., United States v. Goins*, 593 F.2d 88, 92 (8th Cir.1979) (statement to daughter could be against declarant's penal interest); *United States v. Lang*, 589 F.2d 92, 97 (2d Cir.1978) (statement to cellmate could be against declarant's penal interest); *United States v. Bagley*, 537 F.2d 162, 165 (5th Cir.1976) (same); *People v. Petros*, 198 Mich.App. 401, 499 N.W.2d 784, 791 (1993) (statement to friend qualifies as a statement against penal interest). *But see United States v. Battiste*, 834 F.Supp. 995, 1006–07 & n. 11 (N.D.Ill.1993) (statement to brother did not qualify as a statement against penal interest).

In short, the trial court could properly find that, despite the potential statute of limitations problem and despite the fact that John Linton made his disclosures to an intimate companion, his statements "so far tended to subject [him] to ... criminal liability ... that a reasonable person in [his] position would not have made the statement unless believing it to be true." A.R.E. 804(b)(3).

### b. *Confrontation*

 Linton separately asserts that the admission of John Linton's statements violat-

penal interest implicating third parties when, as here, admission is sought against the third parties, his point may have merit. A number of cases dealing with Federal Rule of Evidence 804(b)(3) indicate that the trustworthiness of a statement against penal interest should be corroborated before the statement is admitted against a third party collaterally implicated therein. *See, e.g., United States v. Flores*, 985 F.2d 770, 774 n. 10 (5th Cir.1993); *United States v. Taggart*, 944 F.2d 837, 840 (11th Cir.1991); *United States v. Garcia*, 897 F.2d 1413, 1420 (7th Cir.1990); *United States v. Boyce*, 849 F.2d 833, 836 (3d Cir.1988); *United States v. Stratton*, 779 F.2d 820, 828 n. 7 (2d Cir.1985); *United States v. Riley*, 657 F.2d 1377, 1384 (8th Cir.1981). Such a requirement would in effect parallel the requirement of "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement" that A.R.E. 804(b)(3) expressly imposes as a condition of admitting statements against penal interest by third parties exculpating the accused.

Assuming such a corroboration requirement applies to the present case, we find abundant corroboration of the trustworthiness of John Linton's out-of-court statement, including, most notably, the discovery of Elfriede's cranium on Linton's property.

ed his constitutional right to confrontation. U.S. Const. amend. VI; Alaska Const. art. I, § 11. Even when admissible under an exception to the hearsay rule, an out-of-court statement offered against the accused in a criminal prosecution must be excluded if it impinges upon the accused's right of confrontation. Under the confrontation clause, a hearsay statement is admissible against the accused

> only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *see also Hawley v. State*, 614 P.2d 1349, 1358 (Alaska 1980); *Charles v. State*, 780 P.2d 377, 382 (Alaska App.1989).

■ There currently appears to be much confusion as to whether the declarations against penal interest exception to the hearsay rule is "firmly rooted" for confrontation clause purposes. *Compare, e.g., United States v. Flores*, 985 F.2d 770, 780 (5th Cir. 1993), and *United States v. Battiste*, 834 F.Supp. 995, 1001 (N.D.Ill.1993), *with United States v. York*, 933 F.2d 1343, 1363 (7th Cir.1991), and *United States v. Innamorati*, 996 F.2d 456, 474 n. 4 (1st Cir.1993). At least as to the confession of an accomplice implicating a criminal defendant, the issue appears settled that the exception is not firmly rooted. *See Lee v. Illinois*, 476 U.S. 530, 544 n. 5, 106 S.Ct. 2056, 2064 n. 5, 90 L.Ed.2d 514 (1986). In the present case, the prudent choice is clearly to assume that declarations against penal interest do not comprise a firmly rooted exception to the hearsay rule and that "particularized guarantees of trustworthiness" must be shown before the requirements of the confrontation clause can be met.

■ For purposes of determining whether "particularized guarantees of trustworthiness" exist in a given case, the totality of the circumstances must be considered, but "the relevant circumstances include only those that surround the making of the state-

ment and that render the declarant particularly worthy of belief." *Idaho v. Wright*, 497 U.S. 805, 819, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990). Evidence that is not intrinsically related to the circumstances in which a hearsay statement was made but merely corroborates the statement's truthfulness cannot properly be considered, since "the use of corroborating evidence to support a hearsay statement's 'particularized guarantees of trustworthiness' would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial." *Id.* at 823, 110 S.Ct. at 3150.

■ Here, the circumstances surrounding John Linton's statement provide ample assurance of the reliability of his statement implicating Linton as Elfriede's murderer. John Linton's statement to Pieroni was in the nature of a spontaneous confession and was from all appearances prompted by Linton's inability to cope with the guilt he felt for his role in the incident. The statement was made to an intimate and trusted companion in the absence of any apparent reason for deception. Although the events related by John Linton were not recent, they were not the kind of events that would ordinarily fade or become confused with the passage of time. Moreover, while John Linton's account of his own actions implicated another person in the commission of a crime, there is no indication that he attempted to minimize his own role or shift blame. Significantly, the person John Linton implicated was his own son. The record reveals no basis for believing that John Linton had even the slightest reason to accuse his son falsely. To the contrary, all of the evidence at trial established that John Linton and his son enjoyed a close and harmonious relationship throughout the course of John's life.

■ Of course, the truthfulness and accuracy of Pieroni's testimony concerning John Linton's out-of-court statement was open to question. But Pieroni testified personally and was thoroughly cross-examined; his credibility was an issue " 'exclusively within the province' of the trier of fact." *Broderick v. Kings Way Assembly of God Church*, 808

P.2d 1211, 1220 (Alaska 1991) (quoting *Grasle Electric v. Clark,* 525 P.2d 1081, 1083 (Alaska 1974). The jury obviously found his testimony believable. Accepting Pieroni's testimony as true, we think it fair to say that "the declarant's [that is, John Linton's] truthfulness is so clear from the surrounding circumstances that the test of cross-examination [as to John Linton] would be of marginal utility" and would add little to his reliability. *Wright,* 497 U.S. at 820, 110 S.Ct. at 3149. Under these circumstances, admission of the hearsay statement did not violate Linton's right to confrontation.

### 2. *Elfriede's State of Mind*

Linton next contends that the trial court erred in allowing the jury to hear the testimony of three witnesses describing Elfriede's fear of Linton prior to her disappearance. The disputed testimony was elicited from three of Elfriede's friends, Ingrid Pierce, Ann Schuyler and Linda Castor. At trial, over Linton's objection, Pierce testified that Elfriede was afraid of Linton and had expressed a desire to leave him. Pierce told the jury that she purchased an airline ticket for Elfriede to come to Michigan and that, although Elfriede initially agreed to come, she called Pierce back and said "She couldn't leave because she ... couldn't leave her kids."

Ann Schuyler testified that Elfriede was at times afraid of Linton and slept with a knife under her pillow. Elfriede particularly feared that Linton might have her deported and keep custody of their children. According to Schuyler, Elfriede would never have left the children voluntarily. Linda Castor, another friend of Elfriede, testified that Elfriede told her that Linton had "offered to pay her ticket, [to] go back to Germany but she wasn't allowed to take the children with her." According to Castor, Elfriede remarked that Linton "would get the kids over her dead body."

Judge Steinkruger ruled this evidence admissible to show Elfriede's state of mind under A.R.E. 803(3), which allows admission of

[a] statement of the declarant's then existing state of mind, emotion, sensation, or

physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) offered to prove his present condition or future action, but not including a statement of memory or belief to prove the fact remembered or believed[.]

Linton contends that the court erred in relying on this rule to justify the admission of this evidence. Linton points to authorities holding that evidence of a murder victim's expressions of fear of the accused is generally inadmissible to prove the accused's identity as the murderer or to establish the accused's motive. *See State v. Charo,* 156 Ariz. 561, 754 P.2d 288 (1988); *People v. Ruiz,* 44 Cal.3d 589, 244 Cal.Rptr. 200, 749 P.2d 854 (1988).

These authorities, however, merely recognize the general proposition that, even when evidence of a victim's state of mind qualifies under A.R.E. 803(3), the evidence must be directly relevant to some genuinely disputed issue before it is properly admissible. The corollary proposition is that such state-of-mind evidence is inadmissible if its only relevance is as circumstantial evidence of the accused's conduct, that is, if its probative value depends on the impermissible inference that, because the victim feared the accused, the accused likely did something or planned to do something to justify the fear.

Both of these propositions flow in turn from the explicit language of A.R.E. 803(3) prohibiting the use of "a statement of memory or belief to prove the fact remembered or believed," a limitation "necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind." Alaska Evidence Rules Commentary 803(3). As the state correctly points out, courts have had little difficulty admitting evidence of a murder victim's fear of the accused when the victim's fear was relevant to a material issue other than "the happening of the event which produced the state of mind." *See, e.g., State v. Christensen,* 129 Ariz. 32, 628 P.2d 580, 584 (1981).

Here, the disputed evidence relating to Elfriede's fear of Linton was not used to

prove "the happening of the event that produced the state of mind." In the aftermath of Elfriede's disappearance, Linton made a number of conflicting statements indicating that Elfriede had left him for another man or that she had returned home to Germany. At trial, the state attempted to establish the falsity of these explanations by proving that Elfriede would never have considered leaving Linton without her two children. Indeed, under the state's theory of the case, Elfriede's refusal to leave provided Linton with the motive to kill her.

In support of this theory, the state introduced evidence to show that Linton's marriage to Elfriede had deteriorated and was failing by the time Linton was discharged from the Army. The state's evidence indicated that Linton wanted Elfriede to return home to Germany and that he wanted to retain sole custody of their two children; Elfriede, however, refused to leave her children behind. The state's evidence further tended to show that, during the year preceding Elfriede's disappearance, Linton engaged in conduct aimed at frightening Elfriede away; despite these efforts, Elfriede would not leave. Various prosecution witnesses, including Ingrid Pierce, Ann Schuyler and Linda Castor, insisted that, although Elfriede had in fact become frightened of Linton, she would never have considered leaving him without taking her children.

Viewing the disputed state-of-mind evidence against this evidentiary backdrop makes it apparent that the state did not offer the testimony concerning Elfriede's fear of Linton to prove that Linton had in fact previously harmed her or to support the impermissible subsidiary inference that Linton's past acts of harm toward Elfriede made it more likely that he was her killer.[6] Rather, the state offered this evidence to suggest a plausible motive for Linton's commission of the alleged crime: that Linton resorted to murder when his attempts to talk Elfriede into leaving and his attempts to drive her away—including his apparent success at frightening her—had failed. For this purpose, the disputed evidence was admissible under A.R.E. 803(3). The trial court's decision to admit it did not amount to an abuse of discretion.

### C. Dismissal

Linton lastly argues that the trial court erred in denying his motion to dismiss his indictment. Linton's dismissal motion, however, was largely predicated on his contention that Pieroni's testimony concerning John Linton's confession and the testimony of Ingrid Pierce, Ann Schuyler and Linda Castor concerning Elfriede's fear of Linton amounted to inadmissible hearsay. Our holding that the testimony of these witnesses was admissible at trial thus disposes of Linton's challenge to the validity of his indictment.[7]

### CONCLUSION

Finding no error, we AFFIRM the conviction.

---

6. It is equally apparent that the state did not attempt to use the evidence of Elfriede's state of mind as proof of Linton's state of mind in order to establish his likely conduct—that is, the state did not attempt to prove that Elfriede's fear of Linton indicated that Linton was in fact planning to harm her and that he therefore probably did so. Such use would have been equally impermissible under A.R.E. 803(3). *See* Alaska Evidence Rules Commentary 803(3) ("For the statements of one person as to his mental or emotional condition to be used against another, Subdivision (23) [A.R.E. 803(23)] must be satisfied.") Notably, Judge Steinkruger offered Linton a cautionary instruction to inform the jury that the testimony of Pierce, Schulyer, and Castor could not be considered for the truth of the matters asserted therein.

7. To a certain extent, the grand jury testimony of Pierce, Schuyler and Castor was broader than their trial testimony and included statements that are arguably objectionable. In denying the motion to dismiss, however, Judge Steinkruger found that, any error was harmless, since, even if the entirety of the testimony offered by these witnesses were excised, sufficient evidence would remain in the grand jury record to support Linton's indictment. Although Linton's failure to include a transcript of the grand jury hearing as part of the record on appeal precludes definitive review of Judge Steinkruger's harmless error finding, nothing in the record currently before this court or in the briefs submitted by the parties provides a basis for questioning this finding.