**Ronald SMITH, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–8017.**

Court of Appeals of Alaska.

Dec. 12, 2003.

---

13. *Id.*

Averil Lerman, Assistant Public Advocate, and Brant McGee, Public Advocate, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## *OPINION*

COATS, Chief Judge.

A jury convicted Ronald Smith of murder in the second degree,[1] robbery in the first degree,[2] and assault in the first degree.[3] Superior Court Judge Larry Weeks sentenced Smith to a composite term of 85 years. Smith appeals, raising several issues. In his main issue on appeal, Smith contends that Judge Weeks erred in admitting the hearsay statements of Zachary Brown. Smith contends that Brown's statements were inadmissible hearsay and that admission of the statements violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and under Article 1, Section 11 of the Alaska Constitution. We agree with Smith that Brown's statements were erroneously admitted and reverse his convictions.

### *Factual background*

The grand jury charged Smith and Rey Soto with the second-degree murder of Kenneth Thomas, the first-degree assault of Alfred Torres, and robbery in the first-degree.

Torres and Thomas lived in a trailer home in an area known as "The Village" in Juneau, Alaska. In the early morning hours of January 25, 2000, Torres testified that he, his girlfriend Stephanie Sanders, Thomas, and a friend, Mark Paddock, were watching a movie when they heard a knock at the door.

---

1. AS 11.41.110(a)(2),(3).

2. AS 11.41.500(a)(3).

3. AS 11.41.200(a)(1).

Torres testified that after he unlocked and opened the door, a black man (later determined to be Smith) wearing a ski mask and dark-colored clothes, rushed through the door pointing a silver pump-action shotgun at him. Torres testified that another man (later determined to be Soto) followed Smith wielding a baseball bat.

Torres stated that as he tried to grab the shotgun and wrest it from Smith, Soto hit him with the bat. As Torres and Smith struggled, Thomas ran to help Torres and Soto hit Thomas in the head. Torres attempted to run away, but according to Torres, Smith caught him and beat him with the shotgun. At this point, according to Torres, Smith ordered Torres and the other occupants of the trailer to give him "money and stuff." Torres testified that he complied and gave Smith his wallet containing $20 and a coffee mug containing approximately six grams of marijuana. Smith and Soto left and Torres and Paddock witnessed a dark car leave the area.

Torres and his friends then took Thomas to the hospital. On the way, they observed the dark car, noted the license number and reported the incident to the police. Thomas died at the hospital from a massive skull fracture. Torres suffered a dislocated shoulder, head lacerations, and a possible concussion.

Based on the report, the police stopped Smith and Soto's car and arrested them. The police found a baseball bat, two ski masks, a small baggie containing marijuana, and a blood spattered-coffee mug. The shotgun was not found in the car. Based on a tip, the police later located the shotgun in the woods. Smith and Soto had blood on their clothing and shoes and some currency found in Soto's pocket had blood on it as well. Alaska State criminalist Abirami Chidambaram testified that the blood on Smith's and Soto's clothing, the bat, the coffee mug, and the currency from Soto's pocket matched the DNA profiles of Thomas and Torres.

Smith initially denied any involvement in the crime and stated that he knew nothing about the shotgun or the ski masks. When asked about the blood on his clothing, Smith told the Juneau Police Department that he

had been in a fight a couple of days before and had not changed his clothes.

At trial, Smith testified that he did not go to Torres's residence to rob, but to purchase marijuana. He claimed he and Soto did not bring a shotgun, a bat, or wear ski masks. He went to The Village to buy a gram of marijuana from Torres for $25. According to Smith, after Torres offered the baggie of marijuana to him, he protested because he believed the baggie did not contain a full gram of marijuana. At this point, Torres left the door of the trailer, apparently to get more marijuana. When Torres returned, carrying a baseball bat, Smith testified that Torres was singing a nursery rhyme, "something like, 'my darling dearest adorable one, now you must pay for the shit you have done,'" and proceeded to attack Smith with the bat. Smith testified that the bat belonged to Torres. Smith testified that in the course of defending himself, he wrested the bat from Torres and tossed it aside. Soto then picked the bat up and struck Thomas. Smith stated that he and Torres exchanged blows until he and Soto retreated to the car and left.

Soto testified similarly. Specifically, Soto testified that he went to Smith's aid when he witnessed Torres and Thomas attack Smith. Soto claimed he hit Thomas with the bat in self defense because Thomas was running at him. Soto testified that he retreated to the car with his bat and kept the bat so that neither he nor Smith could be attacked with it. Soto also denied that he and Smith wore ski masks or had a shotgun.

The jury convicted Smith and Soto of murder in the second degree, robbery in the first degree, and assault in the first degree.

### Zachary Brown's hearsay statements

 At trial, the State sought to admit statements that an unavailable witness, Zachary Brown, allegedly made to his girlfriend, Caroline Gerken. According to Gerken, she had a private conversation with Brown on January 25, 2000, between 2:00 and 4:00 p.m. (The incident that led to the robbery, murder, and assault charges took place during the early morning hours of January 25,

2000.) According to Gerken, she told Brown that she was concerned about him because of the police crime scene tape that she had seen near his residence. Brown told her that he had spoken to the police earlier in the day. Gerken then testified that she asked Brown if he knew anything about the investigation. She testified:

A. He said that he was woken up about 4:15, 4:30 in the morning by Rey [Soto] and Ron [Smith], and they asked if they could borrow his shotgun for a minute. They said they'd be back in five minutes, and left. He took all the bullets out of it, and they left. Then—excuse me—he remembered them coming back around 5:00 ... or so and just left it, and they left right away.

Q. Okay. He remembered that they came back at 5:00 and you said just left it.

A. Yeah, they just put it back against the wall.

Q. And then what did he say?

A. He fell back to sleep, and woke up in the morning, looked at his gun, said he saw what appeared to be dried blood, just very, very few splatters on it, on the gun, and he got really freaked out and scared, didn't know what happened, and he cleaned the gun.

Gerken then testified that Brown told her that he took the pistol grip off the gun and disposed of it in the channel. Gerken stated that Brown had told her that "Kyle [Nalan] had offered to say that he was there when they came in to get the gun, and he agreed." According to Gerken, Brown stated that because Nalan had offered to say that he had been present, Brown was also going to say that Nalan had been present.

Later in the day Gerken spoke to Nalan. Nalan told Gerken that, although he had not been present at Brown's residence when Smith and Soto had allegedly obtained the shotgun, he was going to testify that he had been at Brown's residence, slept on the couch, and had witnessed the incident. Gerken testified that she did not know if Brown knew Torres or Thomas.

At trial, Nalan testified that he was present when Smith and Soto picked up the shotgun. David Shaw, who identified himself as a friend of Nalan's, testified that Nalan told him that he had not been present at Brown's residence when Smith and Soto allegedly picked up the shotgun.

Upon the State's motion, the superior court admitted Brown's statements at trial as declarations against interest under Evidence Rule 804(b)(3). Declarations against interest are not excluded by the hearsay rule if the declarant is unavailable and the statement "was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." [4]

Brown was unavailable because he exercised his Fifth Amendment right to not testify. The State contends that Brown's statements that he gave the shotgun to Smith and Soto shortly before they used the weapon in the robbery and homicide and that he later cleaned the blood from the weapon and hid it, qualified as statements against interest. The State argues that Brown would not have admitted giving Smith and Soto the shotgun shortly before their alleged crimes and would not have admitted disposing of evidence unless these statements were true. According to the State, Brown's statement that he had given the shotgun to Smith and Soto put him at risk of being charged as an accomplice to the crimes. Brown's statement that he subsequently cleaned and disposed of the shotgun would subject him to being charged with tampering with physical evidence.

A problem with the State's contention that Brown's statements were a declaration against interest is that Brown's statements that Smith and Soto were the people who picked up the shotgun does not appear to be necessary to make Brown's statements a declaration against interest. For example, had Brown stated that he gave the shotgun to

---

4. A.R.E. 804(b)(3).

Torres (or anyone else involved) shortly before the incident, that statement would similarly have been against Brown's interest. Therefore, it does not appear that the part of Brown's statement identifying Smith and Soto as the people who picked up the shotgun and then returned it would qualify as a declaration against interest.[5]

It is true that the other portions of Brown's statement about removing the pistol grip off the gun and disposing of it in the channel clearly subjected him to a charge of tampering with physical evidence,[6] as did his statement that after waking up and discovering his gun had dried blood splatters on it, he cleaned the gun. However, in evaluating a declarant's statements, courts must view the statements separately and sever a declarant's non-inculpatory statements before a court admits a declarant's inculpatory statements under Rule 804(b)(3).[7]

The United States Supreme Court construed Federal Rule of Evidence 804(b)(3), the federal counterpart to Alaska Evidence Rule 804(b)(3) in *Williamson v. United States*,[8] and concluded that courts should "not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else."[9] In explaining the limits of its decision, the Court noted, however, that "whether a statement is self-inculpa-

tory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest."[10] Many states have followed *Williamson*,[11] but Alaska has never expressly adopted its holding. Assuming *arguendo* that the *Williamson* rule is applicable in Alaska, nonetheless, when viewed in context with Brown's other statements, Brown's statement identifying Smith and Soto is still not against his interest for the reasons previously stated. In sum, we conclude that the superior court abused its discretion in admitting the portion of Brown's hearsay statements identifying Smith and Soto as the ones who borrowed the shotgun.

We must also examine Brown's statements under the Confrontation Clause. Both the federal and state constitutions guarantee a defendant's right to confront the witnesses against him.[12]

Under the [C]onfrontation [C]lause, a hearsay statement is admissible against the accused "only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of

5. See *Williamson v. United States*, 512 U.S. 594, 600–03, 114 S.Ct. 2431, 2435–37, 129 L.Ed.2d 476 (1994).

6. AS 11.56.610(a)(1).

7. *Williamson*, 512 U.S. at 602–03, 114 S.Ct. at 2436–37.

8. 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).

9. *Id.* at 601, 114 S.Ct. at 2435.

10. *Id.* at 603, 114 S.Ct. at 2436.

11. See, e.g., *State v. Soto–Fong*, 187 Ariz. 186, 928 P.2d 610 (1996); *People v. Duarte*, 24 Cal.4th 603, 101 Cal.Rptr.2d 701, 12 P.3d 1110 (2000); *State v. Schiappa*, 248 Conn. 132, 728 A.2d 466 (1999); *Smith v. State*, 647 A.2d 1083 (Del.1994); *Brooks v. State*, 787 So.2d 765 (Fla.2001); *Gabow v. Commonwealth*, 34 S.W.3d 63 (Ky.2000);

*State v. Lucky*, 755 So.2d 845 (La.1999); *State v. Matusky*, 343 Md. 467, 682 A.2d 694 (1996); *State v. Dukes*, 544 N.W.2d 13 (Minn.1996); *Williams v. State*, 667 So.2d 15 (Miss.1996); *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117 (2000); *State v. Benavidez*, 128 N.M. 261, 992 P.2d 274 (1999); *People v. James*, 93 N.Y.2d 620, 695 N.Y.S.2d 715, 717 N.E.2d 1052 (1999); *Commonwealth v. Robins*, 571 Pa. 248, 812 A.2d 514 (2002); *State v. Pacheco*, 763 A.2d 971 (R.I. 2001); *State v. Fuller*, 337 S.C. 236, 523 S.E.2d 168 (1999); *State v. Roberts*, 142 Wash.2d 471, 14 P.3d 713 (Wa.2000); *State v. Mason*, 194 W.Va. 221, 460 S.E.2d 36 (1995); *Johnson v. State*, 930 P.2d 358 (Wyo.1996). *But see People v. Newton*, 966 P.2d 563 (Colo.1998); *State v. Hills*, 264 Kan. 437, 957 P.2d 496 (1998); *State v. Sonthikoummane*, 145 N.H. 316, 769 A.2d 330 (2000); *Chandler v. Commonwealth*, 249 Va. 270, 455 S.E.2d 219 (1995).

12. U.S. Const. amend. VI; Alaska Const. art. I, § 11.

trustworthiness." [13]

Declarations against interest are not a "firmly rooted hearsay exception." [14] In order to admit hearsay statements under the Confrontation Clause a court must find that the "statements were so inherently reliable that cross-examination would have been superfluous." [15]

Looking at Brown's statements in context, Brown's statements do not meet that standard. As we have previously pointed out, the portion of Brown's statement identifying Soto and Smith as the people who picked up the shotgun does not qualify as a statement against interest. Furthermore, the part of Brown's statement about Nalan undermines the reliability of Brown's statement. According to Gerken's account of Brown's statement, it appears that Brown suggested that Nalan was going to lie and say that Nalan had been present when Smith and Soto had allegedly picked up the shotgun. If giving Smith and Soto the shotgun was against Brown's interest, why would Nalan falsely corroborate that Brown had done an act which the State argues subjected Brown to being charged as an accessory? The State could argue that perhaps Brown and Nalan wanted to minimize Brown's willingness to give Smith and Soto the shotgun. Smith would probably want to argue that Brown wanted Nalan to lie because the incident never happened and Brown was trying to frame Smith and help Torres. But that portion of Brown's statement that Nalan was going to falsely claim he witnessed the shotgun transfer at least suggests that Brown was not being entirely candid about the incident and demonstrates that Brown's statements were not "so inherently reliable that cross-examination would have been superfluous."

Furthermore, the relationships between Brown, Smith, Soto, Thomas, and Torres do not show that Brown did not have a motive to make a false statement implicating Smith and Soto.[16] Smith presented some evidence that suggested that Brown was frequently at the residence of Thomas and Torres and was therefore acquainted with them. Although Torres denied that he knew Brown, Torres's testimony regarding Brown conflicted with Deborah Schorr's testimony. Schorr testified that she was a defense investigator and that during the course of her investigation, Crystal Ann Williams informed her that Brown was always over at Torres's trailer, suggesting that perhaps Torres did know Brown and that Torres and Brown might be friends. Williams testified that she did not know if Brown knew Torres and Williams. Gerken testified that Brown was unemployed and was apparently dealing drugs out of his apartment. So apparently Brown, Thomas, and Torres, as well as Smith and Soto, were involved in dealing drugs. The facts suggest that the statements that Brown allegedly made to Gerken were not so inherently reliable that they should have been admitted without allowing Smith the opportunity to cross-examine Brown. Consequently, we conclude that the superior court violated the Confrontation Clause when it admitted Brown's hearsay statements.

The State argues that Smith did not properly object to Gerken's proposed testimony. But the record reveals that Smith did object to Gerken's proffered testimony about Brown's statements and argued that the testimony was not admissible as a declaration against interest and the statements could not be admitted because Smith did not have the opportunity to confront and cross-examine Brown regarding his statements. Smith's objection was sufficient to preserve his claim.

The State also argues that admission of Brown's hearsay statement was harmless error. But Brown's hearsay statements were admitted in violation of Smith's constitutional right to cross-examine the witnesses against

**13.** *Linton v. State*, 880 P.2d 123, 129 (Alaska App.1994) (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)).

**14.** *Lilly v. Virginia*, 527 U.S. 116, 134, 119 S.Ct. 1887, 1899, 144 L.Ed.2d 117 (1999); *Porterfield v. State*, 68 P.3d 1286, 1291 (Alaska App.2003).

**15.** *Lilly,* 527 U.S. at 139, 119 S.Ct. at 1901.

**16.** *See Linton,* 880 P.2d at 128 n. 5.

him. Since the evidence was admitted in violation of Smith's constitutional rights, we cannot uphold Smith's convictions unless we find that the error was harmless beyond a reasonable doubt.[17] Under this standard, we are unable to find that the error was harmless.

The central conflict in the case was whether Smith and Soto went to the trailer to rob the inhabitants or whether Smith and Soto acted in self-defense when Torres attacked them. A central part of the State's theory that Smith and Soto intended to commit a robbery was that Smith and Soto went to the trailer wearing ski masks and armed with a shotgun and a baseball bat. The people present at the residence testified that Smith and Soto went to the trailer so armed and wearing ski masks. Smith and Soto testified that they were not wearing ski masks and did not bring any weapons. Therefore, Brown's statement that, shortly before the incident, Smith and Soto came to his residence and borrowed the shotgun, returning it a short time later, was significant evidence in support of the State's theory. If Smith and Soto did borrow the shotgun from Brown, it contradicted their testimony and tended to show that they had gone to Torres's trailer intending to commit a robbery.

The State argues that Brown's hearsay statement was not significant because Kyle Nalan testified that Smith and Soto obtained the shotgun from Brown shortly before the incident. It is true that Kyle Nalan testified that he was present when Smith and Soto obtained the shotgun from Brown. But Smith undermined Nalan's testimony by presenting evidence that Nalan lied about being present. A jury might therefore have had questions about Nalan's credibility.

Smith also presented evidence which placed in question the State's physical evidence that supported the State's theory that Smith and Soto went to Torres's residence to commit a robbery. Kathleen Mazon testified

that two weeks prior to the incident she had observed a baseball bat inside Torres's trailer. This supports the defense theory that the baseball bat belonged to Torres and that Torres took the baseball bat from his trailer before he attacked Smith. Also contrary to testimony provided by the State's witnesses, Smith's and Soto's testimony that they were not wearing ski masks was similarly supported by the physical evidence. Alaska State Criminalist Kristin Denning analyzed the ski masks the police found in the car immediately after the incident and testified that the ski masks did not contain any hair or other DNA evidence identifying Smith or Soto. Denning also testified that Smith's clothing and jacket were covered with blood and blood splatter from the altercation, but the ski masks did not have any blood on them. Denning also testified that there was no blood on the shotgun and it did not appear to have been cleaned—thus supporting the defense theory that Smith or Soto did not bring a shotgun to the trailer or use a shotgun during the altercation.

Consequently, Brown's hearsay testimony that Smith and Soto obtained the shotgun from him shortly before the incident might have been critical to the jury in deciding whether Smith and Soto armed themselves before going to Torres's residence. We are therefore unable to find that the erroneous admission of Brown's hearsay statement was harmless error beyond a reasonable doubt.

*Conclusion*

We accordingly conclude that Smith's convictions must be reversed.

REVERSED.

---

**17.** *See Wyatt v. State*, 981 P.2d 109, 112 (Alaska 1999).